FRANCOIS COURTINARD, RESPONDENT, v. GRAY BURIAL AND CREMATION COMPANY, RESPONDENT, AND ELIZABETH CASEY ET AL., APPELLANTS.

Submitted December 11, 1922—Decided May 4, 1923.

1. Defendants, a firm of undertakers, hired an automobile, with a driver, to go from Plainfield to attend a funeral in Brooklyn. One of the defendants rode on the front seat with the driver, but gave no directions and exercised no control over the machine, except to state to the driver their destination. While the automobile was crossing an intersecting street in New York City, it struck and injured the plaintiff. *Held*, that as the defendants neither hired, directed nor controlled the driver, nor exercised any power, authority or supervision over him, but left to him the exclusive management, direction and control of the vehicle, the relationship of master and servant did not exist, especially in the absence of any testimony to show that the driver consented, expressly or impliedly, to the transfer of his services, *pro hac vice*, to the defendants.
2. The theory of master and servant, like that of principal and agent, is based upon the legal conception of representation in a chosen and accepted line of service, by which the employe becomes for that particular duty the *alter ego* of the master.

---

On appeal from the Supreme Court.

For the respondent, *Frank J. Higgins.*

For the Gray company, *Kalisch & Kalisch.*

For the appellants, *Winfield S. Angleman.*

The opinion of the court was delivered by

MINTURN, J.   The Gray Burial and Cremation Company of Cranford, in this state, like many undertaking establishments, conducted a livery business in which it let automobiles out for hire.   The defendants, Caseys, were undertakers in business at Plainfield, and hired one of the Gray automobiles, with a driver, to go from Plainfield to a cemetery in Brooklyn, where an interment was to be made under the Caseys' direction.   John F. Casey sat upon the front seat with the driver, but gave no directions and exercised no control over the machine, except to state generally to the driver the cemetery objective of the funeral.   The ferriage fares over the Hudson were paid by the driver, and the entire control and *modus operandi* of the machine was under the direction and management of the Gray driver.

At an intersection at Canal street and the Bowery, in New York City, near the entrance to the Manhattan bridge, the automobile was stopped by a traffic officer in order to allow pedestrians to cross the street.   Among the belated pedestrians was this plaintiff, who, after the signal to cross had been given, was struck by the automobile in question and seriously injured.   The suit was brought to recover damages for his injuries.

The case against the Gray company was decided in its favor by the court upon a motion to nonsuit.   The case against the Caseys was allowed to go to the jury under the court's charges that the Caseys were the employers of the driver of the machine, who thus became their servant, and upon the doctrine of *respondeat superior* the Caseys were made liable by the jury's verdict for the driver's negligence.

The learned trial court based his legal view as to the Caseys' liability upon the well known case of *Cuff* v. *Newark and New York Railroad Co.*, 35 N. J. L. 17.   Affirmed by this court in the same volume at page 574.   But obviously he misconstrued both the rationale and the tenor of that determination.   While the case discusses in an elaborate opinion by Justice Depue the incidental and somewhat cognate relationship of master and servant, the essential question

involved therein was the liability of a landowner for the act
of a servant of an independent contractor. Upon the rule
there laid down a new trial was granted, the case was retried,
and at the June term of the following year this court affirmed
a judgment for the defendant upon the opinion of Justice
Depue in the earlier case, which was adopted as the opinion
of this court. The reasoning of that distinguished jurist
throughout the opinion, makes it manifest, supported by a
wealth of authority, that the doctrine of master and servant,
from which emanates the principle of *respondeat superior,*
is based in essence upon the legal theory inherent in the
maxim, *qui facit per alium facit per se,* involving funda-
mentally the fact of control, direction and representation in
the service at hand. He thus defines the relationship: "That
liability flows," says he, "from the relation of master and
servant, a relation incident to which is the power to select
the servant, and direct him in the execution of the duties of
his employment; and to discharge him when found to be
incompetent; and also the duty to so control his acts that
no injury may be done to third persons."

More than ten years thereafter, the question at bar was
distinctly presented in an opinion by the same learned justice,
in this court, in the case of *N. Y., L. E. & W. R. R. Co.* v.
*Steinbrenner,* 47 *N. J. L.* 161. There the plaintiff hired
the coach and driver to take the plaintiff and his family to
an adjacent resort, to do which it was necessary to cross
the defendant's railroad; and the essential question presented
was whether the alleged contributory negligence by the driver
could be attributed to the plaintiff upon the theory of the
doctrine of master and servant. At that period of the devel-
opment of this department of the law, the case of *Thorogood*
v. *Bryan,* 8 *C. B.* 114, sustained the proposition that the
passenger in a public conveyance by reason of his power and
opportunity of "selection" had "identified" himself with the
owner and his servants, so that in the language of one of the
judges, "he must be considered a party to it." This court
refused to follow that doctrine, and it was therein expressly
repudiated. The wisdom of that repudiation has since been

abundantly justified by the fact that today that much criticised determination constitutes no part of the English law, and has been repudiated by the critical analysis of every standard text writer.

In the Steinbrenner case, the elements of hiring, control, direction and power of dismissal are made distinct *ratio decidendi,* and present the fundamental tests of the liability of the occupant and hirer of the coach, under the legal status test of master and servant.

The flight of time has served to firmly imbed this doctrine in our jurisprudence. Fundamentally, as we have demonstrated in subsequent cases, the theory of master and servant, like that of principal and agent, is based upon the legal conception of representation in a chosen and accepted line of service, by which the employe practically becomes, for that particular duty, the *alter ego* of the master. It becomes manifest, therefore, that the vicarious responsibility of a third party for injury resulting from the negligent act of another can be legally or logically supported upon no other recognized conception. An enumeration of the cases will serve the purpose of elucidating the principle. *Rodenburg* v. *Clinton Garage Co.,* 84 *N. J. L.* 545; *Holler* v. *Ross,* 68 *Id.* 324; *Doran* v. *Thomsen,* 76 *Id.* 754; *Missell* v. *Hayes,* 86 *Id.* 348; *Jennings* v. *Okin,* 88 *Id.* 659; *Cronecker* v. *Hall,* 92 *Id.* 450; *Mann* v. *Max,* 93 *Id.* 191; *Karas* v. *Burns Bros.,* 94 *Id.* 59; *Zampella* v. *Fitzhenry,* 97 *Id.* 517.

Tested, therefore, by this principle, it is manifest from the undisputed facts in the record, that the defendants, Caseys, neither hired, directed nor controlled the driver; nor did they exercise over him power, authority or supervision, more than to impart to him, as was done in the Steinbrenner case, the particular purpose and object of his employment, leaving to him the exclusive management, itinerary direction and control of the vehicle, which factors, as we have observed, present the substantial inquiries and determinative tests for ascertaining the existence of the legal relationship of master and servant, and consequent liability thereunder.

Nor can the factual and legal status of the driver be ignored in dealing with the liability of the parties; for manifestly as a sentient being capable of choosing his own employment, his services could not be transferred to another without his consent, expressly or impliedly given; and whether such transfer was, in fact, effectuated would inevitably become a jury question, whenever, from the testimony, that inquiry would assume the form of a debatable question; for as was stated by Justice Magie, for the Supreme Court, in *D., L. & W. R. R. Co.* v. *Hardy,* 59 *N. J. L.* 35 (affirmed by this court in the same volume at page 562) : "To establish the fact that the servant of one has thus transferred his services to another *pro hac vice,* it must appear that he has assented expressly or impliedly to such transfer. No one could transfer the services of his servant to another master without the servant's consent." But like all other factual inquiries there must be testimony in the case upon which the submission of that question to the jury can be legally predicated; and where, as in the case at bar, no such testimony is apparent, a nonsuit or a direction of a verdict becomes the logical and legal alternative.

In considering the liability of the defendants, Caseys, the Gray company has intervened by briefs to support the judgment. The legal effect of the direction of the court in the Gray case, as a matter of procedure, is not distinctly before us upon this appeal. That inquiry may be determined hereafter upon a subsequent presentation of the question by the plaintiff, as a distinct issue.

The judgment appealed from will be reversed.

WHITE, J. (concurring). I concur in all except the last paragraph of the foregoing opinion. That paragraph seems to me to have no application to the present case. Of course, a servant cannot be deprived, under the fellow-servant doctrine, of *his* right to sue for personal injuries, on the ground that he had by the contract or act of his master become the servant of a new master (also the master of the alleged fellow-servant), in the absence of evidence that he had assented, ex-

pressly or impliedly, to the new relationship. That was the *Hardy Case,* 59 *N. J. L.* 35, cited in the paragraph in question. But to make such assent by the servant the criterion of the new master's liability for the servant's negligence while under such new master's absolute control, and carrying out his instructions, is, I think, contrary to the legal principle involved and to all of our decisions. Suppose, for instance, a master contracted out the services of his chauffeur for a week for the new master's work, and to be under the latter's exclusive and absolute direction and control both in what he did and also in when and how he did it, and that the chauffeur when told by his old master about it had said: "But I won't become his servant for I know he wants anyone who drives for him to take chances, and that he would welsh on me if I or someone else got hurt in consequence; if I do this work, it must be as your servant doing what this new man directs me to do because you order me so to do and you to be responsible to me as my master if I get hurt;" and that is agreed to; and then the new boss puts the chauffeur at the wheel of his new racing car and directs him to run over a crooked, dangerous road at fifty miles per hour to make a certain train, and as a result of the reckless driving someone is run into and injured, can there be any doubt of the liability of the new boss, in spite of the fact that the chauffeur did not assent to becoming his servant, but, on the contrary, expressly declined to do so? Of course not. The assent of the servant has nothing to do with it. It is the control or right to control which fixes the liability, and it is because there was no evidence that the Caseys exercised or had the right to exercise such control so far as the driving of the hearse in question was concerned that I vote to reverse.

KALISCH, J. (dissenting). The prevailing opinion mistakenly assumes that the Gray Burial and Cremation Company conducted a livery business, whereas the fact clearly appears to be that it was engaged in the undertaking business. From aught that the record reveals the letting out of the hearse and limousine with drivers, by the Gray Burial and

Cremation Company, to the Casey firm was the only instance of the kind that the Gray company was engaged in. That the Gray burial company was not conducting a livery business is made plain by Casey, Jr.'s, testimony: "We called up Mr. Gray, I asked him if we could have his hearse and limousine to deliver a body from Plainfield, New Jersey, to Holy Cross cemetery, Brooklyn, and what the rate would be, and he gave us a rate for hearse and driver and limousine and driver. He gave us a rate. We had hearses in Plainfield which we could hire. We didn't own any automobile equipment at that time, but we hired that hearse because his men knew the road."

It is to be observed that Casey, Jr., did not ask the Gray company, in terms, for the hire of a hearse but asked it, "if we could have *his* hearse" for a funeral. The fair inference from this language, in conjunction with that which preceded it is that the Gray company possessed a single automobile hearse which the Caseys wanted to borrow, temporarily, together with its driver, for their use in their business. It is further inferable that the Caseys were induced to apply to the Gray company for the reason, that as an undertaker, it had charge of funerals, which took its hearse to the Holy Cross cemetery, and hence its driver was presumed to be familiar with the road.

But it does not seem to me to be a matter of vital importance whether or not the Gray burial company, as is assumed by the prevailing opinion, did let out its hearse and limousine to other undertakers who applied to the company for the use of the same, so far as the question presented here is concerned, which question seems to be whether under the terms of the contract made by the Gray company with the Caseys the driver of the hearse continued under the control and direction of the Gray burial company, while performing this particular work for the Caseys, or was under the direction and control of the latter—the Caseys who were in charge of and conducting the funeral, so as to make them liable for an act of negligence of the driver, who while driving the hearse along the public highway on

his · way to the Holy Cross cemetery, injured the plaintiff. The opinion of the majority of the court holds that under the facts of the case, as above set out, the Caseys are absolved from any liability for negligent acts of the driver while performing the work for them, and point to *Cuff* v. *Newark and New York Railroad Co.*, 35 *N. J. L.* 17, 574; *New York, Lake Erie & Western Railroad Co.* v. *Steinbrenner*, 47 *Id.* 161, as supporting such a view.

To this view I cannot assent. The cases cited are not applicable to the undisputed facts of the present case.

The case of *Delaware, Lackawanna & Western Railroad Co.* v. *Hardy*, 59 *N. J. L.* 35, affirmed by this court, same volume, 563, deals directly with the legal principles applicable to the facts under discussion. In the Hardy case (at *p.* 37), Magie, J. said: "A general servant of one person may, for a particular work, or a particular occasion, become, *pro hac vice*, the servant of another person. What will suffice to prove the assumption of the dual service gives rise to question. I think the applicable rule is admirably expressed by Lord Watson thus: "I can well conceive that the general servant of A. might, by working towards a common end along with the servants of B. and submitting himself to the control and orders of B., become, *pro hac vice*, B.'s servant in such sense as not only to disable him from recovering from B. for injuries sustained through the fault of B.'s proper servants, but to exclude the liability of A. for injury occasioned by his fault to B.'s own workmen. In order to produce that result the circumstances must be such as to show conclusively that the servant submitted himself to the control of another person than his proper master, and either expressly or impliedly consented to accept that other person as his master for the purpose of the common employment." *Johnson* v. *Lindsay*, 1891 *App. Cas.* 371. "To establish the fact that the servant of one has thus transferred his services to another, *pro hac vice*, it must appear that he has assented, expressly or ·impliedly, to such transfer. No one could transfer the services of his servant to another master without the servant's consent. It must further appear that the servant has, in fact,

entered upon the service and submitted himself to the direction and control of the new master. His assent may be established by direct proof that he agreed to accept the new master and to submit himself to his control or by indirect proof of circumstances justifying the inference of such assent."

So, in *Hartell* v. *T. H. Simonson & Son Co.* (*Court of Appeals*), 218 *N. Y.* 345; 113 *N. E. Rep.* 255, Cuddeback, J., in a well-considered opinion (at *p.* 349), says: "The principles of law which control in this class of cases are quite well settled. A servant in the general employment of one person, who is temporarily loaned to another person to do the latter's work, becomes, for the time being, the servant of the borrower, who is liable for his negligence. But, if the general employer enters into a contract to do the work of another, as an independent contractor, his servants do not become the servants of the person with whom he thus contracts, and the latter is not liable for their negligence." The Gray burial company was not an independent contractor who had agreed to do the work—that is, to bury the deceased, but what it did was to loan its automobile hearse and limousine and drivers thereof to the Caseys so that the latter could have the facilities for doing the work which they had agreed to do for the family of the deceased. The fact that the Caseys paid the Gray burial company for the hire of these facilities is of no material consequence under the undisputed facts of this case. Nor can it be properly said that the driver of the hearse did not consent to have his services transferred to the Caseys for that particular service—that is, to drive the hearse at the funeral, for. as was said in the Hardy case, that the assent of the servant to the transfer may be implied from the circumstances, and it does not appear that there was any dissent, but, on the contrary, it does appear that the driver put himself willingly under the direction and control of the Caseys in the conducting of the funeral. I say control and direction because it is undenied that the Caseys had sole control of the funeral arrangements and of the funeral cortege to the ceme-

tery. Casey, Jr., sat on the seat of the hearse next to the driver. It is true that Casey gave no directions how to drive or what particular road to follow. No occasion arose for the purpose indicated. The absence of any directions is unimportant. If the driver of the hearse had insisted upon going into Greenwood cemetery instead of the Holy Cross, who was there but Casey, Jr., to control and direct him. It is not necessary, it seems to me, that actual direction and control should have been exercised, it is sufficient that the power of control and direction is necessarily connected with the work which was to be performed.

In the *Hartell Case, supra,* the court referred to *Schmedes* v. *Deffaa,* 214 *N. Y.* 675; 108 *N. E. Rep.* 1107, and further says: "On the other hand, in *Schmedes* v. *Deffaa, supra,* a livery stable keeper who had an order from an undertaker to furnish carriages for a funeral, not having sufficient number of carriages of his own, applied to another liveryman for an additional carriage and driver. The second liveryman sent a carriage and driver as requested. That clearly was a case where the first liveryman procured additional facilities for doing his own work, and it was held in this court that he was liable for the driver's negligence."

This case seems to be on all fours with the case before us. The Caseys had no automobile equipment and they wanted to go a long distance, and in order to facilitate their work they procured the automobile hearse and limousine with their drivers from the Gray burial company, who had no interest whatever in the conduct of the funeral.

*Shear. & Redf. Neg.* (6th ed.) 390, says: "Servants who are employed and paid by one person may nevertheless be *ad hoc,* the servant of another in a particular transaction, *and that, too, where the general employer is interested in the work."*

The funeral was under the control and management of Caseys, the undertakers. It was not essential in order to incur liability that they should have given orders and directions to the drivers. The fact that they had the control and

management of the funeral was sufficient in law to make them answerable for the negligence of the drivers. The sole test of liability is not whether they gave orders or directions to the drivers, but whether they assumed and had control and management of the funeral. That they had such control and management is not denied. In *Coughlan* v. *City of Cambridge,* 166 *Mass.* 268; 44 *N. E. Rep.* 218, Morton, J. (at *p.* 249 of the Reporter), says: "It is a well settled rule that one who is the general servant of another may be lent or hired by his master to another, for some special service, so as to become, as to that service, the servant of such third party. The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master, or becomes subject to that of the party to whom he is lent or hired." Many cases of the same state are cited by the learned judge.

The same doctrine is enunciated in *Standard Oil* v. *Anderson,* by Mr. Justice Moody, in speaking for the United States Supreme Court (212 *U. S.* 215, at *pp.* 219, 221 in 53 *Law Ed.*). And on marginal page 222, the learned judge says the inquiry is "whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work."

Much reliance is placed in the prevailing opinion upon the Steinbrenner case, but a mere recitation of its facts will demonstrate how widely and essentially they differ from those of the present case.

In the Steinbrenner case, the plaintiff was riding, with his four nieces, in a coach owned by one Merkins, and driven by a driver who was employed by Merkins. The coach and horses and driver were hired by the plaintiff for Merkins for the journey in the course of which the coach was struck by a passing train and the plaintiff was injured, and in an action by him against the railroad company it was held that the negligence of the driver could not be imputed to the plaintiff, since the former was not a servant of the latter but of Merkins.

The soundness of the decision cannot be reasonably challenged. This is due to the fact that the underlying basis of it was a sound public policy rather than any legitimate logical deduction possible to be made from the doctrine of *"respondeat superior"* or from the legal maxim *"Qui facit per alium facit per se."* For it must be confessed that *"respondeat superior* is in truth," as Mr. Bevan in his valuable treatise on the law of negligence, volume one, page 688, says, "rather a formula whereby liability is referred to its source than the reason for the existence of a liability." And so it seems to me also that the familiar maxim *"Qui facit per alium facit per se,"* is not a formula of liability of a master's vicarious responsibility, arising *per se* from the relationship of master and servant or of principal and agent for all torts committed by the servant or agent. The maxim obviously refers to authorized acts, and not to acts done without authority or apparent authority. *Pollock on Torts,* page 51, marginal page 67.

A sound public policy, however, requires that where a wrongful act was done by a servant or agent in the course of his employment and while on his master's business, to the injury of a third person, such wrongful act shall be attributed to the master or principal, who shall be answerable therefor. The practical soundness and salutariness of this public policy is being constantly exemplified in our daily affairs. Taxi-cab companies and livery companies send out their vehicles with drivers to traverse the public streets and to serve any of the public, for hire and to carry a passenger to such place or places as he may indicate. Now while there is an element of master and servant between the passenger and driver, it is only an incident arising out of the general employment of the driver who is engaged on the general business of his master and employed to do the very thing he was doing when serving and following the directions of the passenger.

The theory of the relation of master and servant, existing between passenger and driver, must give way to the broad public policy that the driver, in obeying the directions given him on the journey by the passenger, is performing the duties

of his general employment and in that respect represents his master and not the passenger, and for any negligence in the performance of such duties, to the injury of a third person, the general employer is liable. That appears to be the doctrine of the Steinbrenner case, above referred to.

To have held otherwise would be equivalent to sanctioning a theory that on each occasion of hiring, the driver became the servant of the hirer to the extent that the former represented the latter and thereby the general employer was relieved from liability for his driver's negligent acts. The viciousness of such a doctrine becomes apparent when it is considered that it would often lead to grave injustice to persons injured through the negligence of drivers of these vehicles in that an impecunious passenger would be the defendant in place of the general employer.

But a different situation presents itself where a livery company, who has demand upon it beyond its capacity for vehicles, with drivers, sends to another livery company for a supply, and obtains and uses them. While it is true that the contract of the general employment existing between the lender of the vehicles, with servants, and such servants remain unimpaired, as to their relative rights springing out of the contract of employment, nevertheless such act of hiring, if not objected to by the servants whose services are to go with the vehicles, would in effect be a transfer of their services, with their implied consent, to the borrower for the occasion for which the borrowed equipment was to be used. In such a posture of affairs the borrower, by accepting the services of the borrowed servants for the occasion, takes them with their vices as well as their virtues, and, upon principle, becomes answerable for their negligence.

In the Hardy case, *supra*, the question was, as to whether Hardy, who was injured by the negligence of a servant of the railroad company, he being a servant of the Passaic Rolling Mills Company which was employed to furnish material and skilled workmen to build a certain railroad bridge, under the direction of engineers of the railroad company (and among the servants furnished was Hardy, who it appears was in-

jured through the negligence of a locomotive engineer), was a fellow servant of the locomotive engineer and, therefore, precluded from recovery against the railroad company. It futher appeared that Hardy had no knowledge that any transfer of his services had been made to the railroad company. It was there held, whether he had such knowledge was a jury question.

That case surely does not countervail the well settled rule that one who is the general servant of another may be lent or hired by his master to another, for some special service, so as to become, as to that service, the servant of such third party.

The question here was not whether the driver of the hearse was a fellow-servant of the drivers of other vehicles in the funeral cortege, if there were any, but whether in the particular service the driver of the hearse was the servant of the Caseys so as to render them liable to the plaintiff for the injuries which he received as a result of the negligence of the driver of the hearse in the performance of such special service. I think they were liable, because when the hearse with a driver and a limousine with a driver were transferred to the Caseys, they were the sole persons exclusively invested with the power of control and direction of the hired servants in the performance of the special service required of them, for the benefit of the Caseys.

Moreover, it does not seem to me to be consonant with sound reason or good policy, that an undertaker in charge and control of a funeral may absolve himself from liability, for the negligence of servants who are engaged in performing a special service for him and for his benefit, upon the plea that the equipment including servants were hired of another.

For the reasons given I vote to affirm the judgment.

*For affirmance*—KALISCH, BLACK, JJ.   2.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KATZENBACH, WHITE, HEPPENHEIMER, GARDNER, ACKERSON, VAN BUSKIRK, JJ.   13.