29 N.J. Super. 411 (1954)
102 A.2d 650
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LOUIS MANNO, NICHOLAS AMODIO AND VINCENT MATTIELLO, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1954.
Decided January 27, 1954.
*414 Before Judges JAYNE, CLAPP and FRANCIS.
Mr. Seymour Gelzer, Deputy Attorney-General, argued the cause for the respondent (Mr. Paul T. Huckin, Deputy Attorney-General, and Acting County Prosecutor of Bergen County, attorney).
Mr. James A. Major argued the cause for the appellants (Messrs. Major & Carlsen, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
Louis Manno, Nicholas Amodio, Vincent Mattiello and Anthony Marchitto were indicted for atrocious assault and battery on one Henry Schneider. There was a severance as to Marchitto and the remaining three were convicted. Manno and Amodio appeal.
The grounds assigned for reversal relate to certain alleged errors in the admission of evidence. At the trial it appeared *415 that Schneider was employed by Eisen Metal Products Company in Lodi, New Jersey, as a maintenance mechanic. This company had a collective bargaining agreement with a union of which Marchitto was the business agent. Schneider was a member of Marchitto's union, and prior to the incident out of which the indictment arose, he seems to have been engaged in organizational activities for a rival union.
Schneider testified that a few days before the assault, he met Marchitto and two men, whose names were not given, at a diner across the street from the plant, where they threatened him with physical harm on account of his union activities.
In the early morning of Monday, February 25, 1952, Marchitto, who claimed to be fearful of a strike at Eisen's after his conversation with Schneider, arranged to have a bus transport 30 or 35 men from Jersey City to Lodi. These men were not employees of the Eisen company. According to Marchitto, they were to be used to avoid a work stoppage in the event the strike occurred. Amodio was one of the passengers.
On arrival at Lodi the bus was parked in the vicinity of the plant. Some of the men remained in it; others alighted and went to the diner where Schneider and Marchitto had had the conversation already referred to.
Manno and Mattiello also had been requested by Marchitto to join the men and they appeared on the scene, having come in automobiles. Manno, Mattiello and Amodio knew each other before this day.
Schneider had been discharged by his employer on the previous Friday. However, his wife was employed by Eisen as well and on this Monday morning he undertook to drive her and a co-employee to work. Nearing the plant, he observed a number of men on both sides of the street in front of it and realizing that their presence was related to the labor trouble, he stopped the car at the next corner, which is about 200 or 250 feet away, and let his passengers out. Then he turned into the intersecting street and began to drive away.
*416 After he had proceeded a short distance, another car overtook him from the rear and forced his car to the right, over the curb and into a tree. About seven men got out of that car and administered a severe beating to him. Then, after warning him to keep his mouth shut about union troubles, they said he would have his "head knocked off" his shoulders, and his "tongue ripped out" of his head if he talked.
He identified Manno, Amodio and Mattiello as being among his assailants. Amodio's confession, which was received in evidence, says that the female shop steward pointed Schneider out and "we got in Mattiello's Oldsmobile" and chased him. "He wouldn't get out of the car so they hit him in the car."
On cross-examination it appeared that Schneider was brought to Marchitto's attorney's office about five weeks later by Marchitto and another person, where he made a statement absolving Marchitto from participation in the actual assault. The statement also indicated an inability to identify Mattiello.
He denied that the reference to Mattiello was the truth and in answer to a question by the court, said he signed the statement because he wanted "to get out of that office."
Shortly thereafter, in answer to some rather leading questions by the court, to which no objections were interposed, he said the untruthful parts of the statement were given because he was afraid of some further physical harm.
Now it is urged that these leading questions constitute error.
It is well known that the allowance of leading questions by counsel to his own witnesses is a matter of discretion with the trial court. State v. Fuersten, 103 N.J.L. 383, 390 (E. & A. 1927); Finkelstein v. Geismar, 91 N.J.L. 46, 50 (Sup. Ct. 1917), affirmed 92 N.J.L. 251 (E. & A. 1918); 3 Wigmore on Evidence (3rd ed. 1940), § 770. The distinction between the leading questions put by counsel to his own witness which may suggest an answer and those put by the court must be noted. Such questions by counsel to a friendly witness manifestly incline him to *417 answer according to the specific tenor thereof, irrespective of his actual memory, or even knowledge of the fact. Those asked by an impartial court must be considered as a search for the truth.
Wigmore explains the distinction:
"(1) One of the natural parts of the judicial function, in its orthodox and sound recognition, is the judge's power and duty to put to the witnesses such additional questions as seem to him desirable to elicit the truth more fully. This just exercise of his function was never doubted at common law; * * *. Fortunately, in spite of the strong but subtle tendency to force the purely judicial function into the background, the tradition of the common law has never been lost; the right of the judge to interrogate as he thinks best has always been preserved in theory. (§ 784, p. 152.)

* * * * * * * *
(2) It follows that a judge's questions may be leading in form, simply because the reason for the prohibition of leading questions has no application to the relation between judge and witness." (§ 784, p. 159.)
It would require a most unusual showing of abuse of the right of the court to ask leading questions to warrant a reversal of a judgment. No such situation exists here. In fact, when consideration is given to Schneider's testimony as to the threats made before the assault, those made as an incident of the assault, and his statement as to the fear for his safety and that of his family which kept him from an immediate report of the incident to the police, there was ample justification for the criticized intervention.
A further attack on the action of the trial court centers around Schneider's statement. The record discloses that after being cross-examined about it and questioned to some extent thereon on redirect examination, he was recalled in rebuttal and further questions were put to him with respect to specific notations or additions which were not in his handwriting. Some of the questions were objected to as not being rebuttal.
At the time of the cross and redirect examination, the document was not in evidence, although marked for identification. It went into evidence as part of the defense, and *418 apparently after study of it by the State rebuttal was deemed necessary.
We suppose it would have been possible for the State to take the time before or during Schneider's redirect examination to go over the writing carefully and cover the same subjects as were covered in the rebuttal. However, it was not done. The order of proof is in the discretion of the court and we see no abuse of that discretion here. Foley v. Brunswick Traction Co., 69 N.J.L. 481 (Sup. Ct. 1903); 3 Jones on Evidence (4th ed. 1938), § 809, p. 1489.
Marchitto was called as a defense witness and his testimony in some respects was in conflict with that of Schneider. On cross-examination he was asked if he had not written or authorized the writing of a letter to the Eisen company as the representative of the union, demanding the discharge of Schneider on the ground that he was no longer a member in good standing in the union. No objections were interposed by defense counsel to the questioning. There was much hedging and disclaiming of recollection about the letter by the witness. In rebuttal, the State called the shop steward of the union, who asserted that she signed the letter at the direction of Marchitto. Again no objections were interposed.
Now it is urged as a basis for reversal that the cross examination of Marchitto about the letter brought in a collateral matter and therefore the State was bound by the answers and could not offer evidence to contradict them on rebuttal. Obviously the letter was not a collateral subject. Marchitto's hostility and animosity toward Schneider were directly in issue when their testimony was in conflict. Consequently it was proper to show that Marchitto caused Schneider to be discharged by his employer a few days before the assault. State v. Salimone, 19 N.J. Super. 600 (App. Div. 1952).
Appellant argues also that it was improper to admit the conversation between Schneider and Marchitto in the diner on February 22, in which Schneider was threatened. The record discloses that the first reference to the diner *419 incident came into the case on cross-examination by the defense. Then, on redirect examination, the threats by Marchitto were introduced  again without objection. After four more questions on the subject, a motion was made that "it all" be stricken as irrelevant and the motion was denied. Even assuming that this was error, the statement of Schneider which the defense introduced in their case specifically described the clash quite in accordance with Schneider's testimony. Under the circumstances, there is no justification for a finding of prejudicial error.
Another error charged concerns the cross-examination of the defense witness McIntyre. This witness was vice-president and general manager of the Eisen company. Perusal of his testimony as a whole plainly demonstrates his hostility to Schneider and his favorable attitude to Marchitto and his union.
He testified that Schneider was discharged at 2:10 P.M. on Friday, February 21, as a disloyal employee, and that Mrs. Schneider was likewise discharged on February 22 for walking off the floor without notifying her supervisor. Presumably this last portion of his testimony was designed to demonstrate that Mrs. Schneider was not driven to the plant by her husband for the purpose of reporting for duty on the following Monday, the day of the assault. However, it developed on further examination that she had absolutely no knowledge of the alleged discharge, not having been advised of it by anyone, and that he had seen her at the plant office on Monday morning. And after much equivocation, he admitted that Schneider was discharged upon receipt of Marchitto's letter ordering it to be done. Furthermore, he conceded that Schneider was reinstated as the result of an order of the National Labor Relations Board.
McIntyre's testimony consumes 26 pages of the appendix. During the lengthy cross-examination the defense made three objections; one was sustained, in one instance the State withdrew the question, and the third had to do with the possibility of one employee's punching the time clock for another. The objection came after the answer had been *420 given, and in any event neither question nor answer was of any consequence in the case. One question was disallowed on redirect examination. The inquiry was as to when Mrs. Schneider was paid for the period during which she was discharged, her reinstatement having been ordered also by the National Labor Relations Board. The immateriality of the matter is obvious.
The examination of McIntyre may have gone somewhat afield. However, he was unquestionably not disinterested; his hostility to Schneider was plain. The defense, by the paucity of its objections, seemed satisfied to speculate on his answers, and study of his entire testimony reveals no manifest error.
Finally, the defense claims the court erroneously permitted appellant Amodio to be asked on cross-examination if he did not have a shotgun alongside his bed at the time of his arrest. Once again, no objections were interposed to any of the four questions on this subject. All of the questions were answered in the negative and the matter was not pursued further. The record shows that on direct examination Amodio voluntarily referred to a conversation with the police about having a gun; also that he volunteered a statement about a police search for guns in the automobile of one of the men who went to the plant on the day of the assault on Schneider. Just when these incidents took place is not clear.
We need not consider the applicability of the rather harsh rule which in some situations seems to permit articles found in an accused's possession or on his premises at the time of his arrest, to be received in evidence even though they may indicate criminality unrelated to the particular charge for which he is being tried. State v. Unger, 103 N.J.L. 18, 23 (Sup. Ct. 1926), affirmed 104 N.J.L. 448 (E. & A. 1928); State v. Catania, 102 N.J.L. 569, 573 (Sup. Ct. 1926), apparently dictum; State v. Sage, 99 N.J.L. 229, 233 (E. & A. 1923); State v. Barone, 96 N.J.L. 417, 419 (Sup. Ct. 1921), affirmed 98 N.J.L. 292 (E. & A. 1922); State v. Cerciello, 86 N.J.L. 309, 312 (E. & A. 1914); *421 State v. Laster, 71 N.J.L. 586 (E. & A. 1905); State v. Bloom, 11 N.J. Misc. 522 (Sup. Ct. 1933). In the light of the failure to object, the voluntary statements of the accused with respect to guns, the negative answers to the questions, and the abandonment of the matter at that point, our examination of the entire record leads us to the conclusion that no prejudicial error resulted. However, it should be added that regardless of a belief in the pertinency of the doctrine supplied by the cited cases, such a course of interrogation should be pursued, if at all, with great caution and with the utmost good faith, for it must be remembered that the mere asking of the question, irrespective of the negative answer, in some circumstances may be prejudicial.
It will be observed that we have noted the absence of objection to the evidentiary matter made the subject of the appeal. R.R. 1:5-1(a) provides that error in the admission of evidence shall be cause for reversal "if specific objection thereto was made and it appears from the entire record of the proceedings had upon the trial that the defendant thereby suffered manifest wrong or injury." It is true that by the same rule we are permitted to notice "plain errors affecting substantial rights of the defendant, although they were not brought to the attention of the trial court." However, the Supreme Court has had occasion recently to observe that this rule "is not a haven of refuge for those who fail to comply with the ordinary rules governing criminal trials" and that counsel cannot sit idly by, speculate on answers and then seek relief from their damaging effect on appeal. State v. Picciotti, 12 N.J. 205, 211 (1953).
The court further undertook to define the kind of case to which the qualification referred to applies. It said:
"The rule is designed to allow the appellate court to consider plain error, though not brought to the attention of the trial court, when its conscience is shocked, when it is convinced that substantial justice was not done below, and that an unjust, unconscionable result was brought about by the error or errors first raised on appeal." (Ibid.)
*422 Aside from the specific treatment given to each of the points raised by appellants, we have studied the record in the light of the Picciotti case and do not find that any such prejudicial error was suffered by them throughout the trial as would justify a reversal of their convictions.
The judgment is affirmed.