50 N.J. Super. 564 (1958)
143 A.2d 197
FRANKLIN M. LAWTON, PLAINTIFF-RESPONDENT,
v.
VIRGINIA STEVEDORING COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 12, 1958.
Decided June 17, 1958.
*567 Before Judges PRICE, HANEMAN and SCHETTINO.
Mr. George P. Moser argued the cause for defendant-appellant (Mr. William V. Roveto of counsel).
Mr. John E. Duffy argued the cause for plaintiff-respondent (Mr. Francis M. McInerney, attorney).
The opinion of the court was delivered by PRICE, S.J.A.D.
Appellant Virginia Stevedoring Company (hereinafter referred to as Virginia) seeks the reversal of a judgment against it for $15,000 entered in the Superior Court, Law Division, in favor of respondent Lawton, an employee of American Export Lines (hereinafter referred to as American). The judgment represented compensation for personal injuries suffered on September 23, 1954 and consequential damages allegedly sustained as the result of the negligence of one of defendant's employees.
Defendant's application for a new trial was denied. It appealed alleging that the trial court committed prejudicial error (a) in its charge to the jury, (b) in rejecting certain of defendant's requests to charge, (c) in its examination of one of defendant's witnesses and in commenting on his testimony, *568 (d) in refusing to set aside the verdict as against the weight of the evidence and excessive.
The record discloses the following facts: On September 23, 1954 plaintiff was engaged for American in his duties as a checker of cargo at Pier F in Jersey City. While so employed he was struck on his left foot by a plank called dunnage, weighing approximately 30 pounds. These planks are of various sizes and are placed under the cargo to keep it dry while on the dock. As the cargo is being removed it becomes necessary to take out the dunnage and place it to one side in order to provide operating space for hand trucks used in removing the remaining piled cargo. The plank in question had slipped from the hands of a laborer, Anthony Parisi, as he was carrying it shoulder-high past the place where plaintiff was standing. The plank struck plaintiff's left foot and he fell to the floor. Parisi and another laborer assisted plaintiff to an erect position and helped him walk about ten feet to a case or box on which they seated him. The men returned to their work. Shortly after they noticed plaintiff unconscious on the pier floor near the box. His head was bleeding and his bladder had emptied. He was given emergency treatment and was removed to a hospital by ambulance.
This suit was instituted against Virginia upon the theory of respondeat superior and was based on the claimed negligence of Parisi, alleged to be a Virginia employee. Defendant asserted that Parisi was not its employee but was employed by plaintiff's employer American, and that plaintiff's sole remedy was against American under the Workmen's Compensation Act. N.J.S.A. 34:15-1 et seq.
Virginia had entered into a contract to furnish American with labor for stevedoring and loft or terminal operations. Defendant was the stevedore for American. By virtue of its contract with American it was responsible for supplying the labor and equipment for loading and discharging vessels owned by American. Under a clause of the contract defendant was responsible also for supplying labor used in discharging cargo from the dock to the trucks or lighters of the *569 ultimate consignees. Specifically, the stevedore gang loads and discharges cargo from docks to ships and from ships to docks; the loft gang discharges cargo from the docks to trucks and lighters as aforesaid.
This clause of the contract dated January 1, 1952 between American and Virginia, which contract was received in evidence, was as follows:
"2. EXTRA LABOR SERVICES: When required to supply extra labor the Contractor will render its charges therefor at the extra labor man hour basis for the following described services unless otherwise specified as cost plus.

* * * * * * * *
m. Supplying extra labor for any other services when authorized."
Lawton's duty as checker on the day in question required him to see that the proper cargo was allocated to a given consignee in accordance with American's delivery tally sheet.
The men who worked in the loft were referred to as the extra labor gang. All such laborers were required to be "validated" by the Waterfront Commission of New York Harbor. They were hired by John F. Manning, who testified that he was employed by Virginia as a hiring agent. The laborers then reported directly to Pier F as long as work was available. The checker would tell them what cargo should be moved, but a plaintiff's witness said that the checker did not attempt to direct the manner in which such operations should be carried out. Laborers received a brass check from Virginia's timekeeper with the words "Virginia Stevedoring, 115 Kent Avenue, Brooklyn, New York" thereon. They were paid by Virginia and were required to surrender the brass check on payday. Virginia was thereafter reimbursed by American for the wages of the men plus a "percentage," described by defendant's witness Douglas W. Main as covering "clerical work, insurance and so on." Parisi testified that on the date of the accident he was a member of the extra labor gang furnished by Virginia, that he was an employee of Virginia and that Manning was his boss.
*570 Frank Baumann, who asserted he was an employee of Virginia and had worked as a dock laborer since approximately 1939, testified as to the procedure employed in hiring dock workers under the auspices of the Waterfront Commission. He outlined the procedure as follows: that a laborer would report initially to the Commission office and be "validated," i.e., certified as a proper person for employment; there a worker would be hired by a "hiring boss" and would report directly to the employer's place of business. The witness testified that he was hired by John Manning at the Waterfront Commission office and thereafter reported to American at Pier F in Jersey City; that since the inception of the Waterfront Commission in 1953 the daily "shape-up" has been abolished and at the end of the working day the employees are told whether they should report to the pier the next morning. He further stated that even then there was no guarantee of employment for the full day; the men were assured four hours pay upon reporting to the pier; thereafter the amount of available work would determine the number of hours they might be employed beyond that period. Baumann further stated that the checkers merely told them which bags on the dock were to be moved; they never attempted to direct the laborers in the method to be employed in accomplishing this assigned task.
John Manning testified that he was an employee of Virginia and was responsible for hiring the labor force in question. He further testified that it was his usual practice to confer with the checkers and assign his men in accordance with the delivery orders that the checkers had. If there were insufficient work to occupy the entire crew for the remainder of the day he selected those persons to be retained.
Stephen S. Abbate, superintendent of terminals for American, testified he was in charge of hiring all employees working for American at Pier F Jersey City. He testified that Manning, Baumann and Parisi were working for Virginia and not for American on September 23, 1954. Virginia's general superintendent Douglas W. Main, however, testified that the payment of the men by Virginia was done solely *571 as an accommodation for American who had no dock labor force on its payroll. He further testified that Parisi was working for American and not for Virginia and that Manning also was actually an employee of American whose name was similarly carried on Virginia's payroll to accommodate American.
Initially, defendant criticizes the court's failure to charge the jury on assumption of risk and contributory negligence, asserted by it to be embodied in the two following requests:
"9. An employee assumes all those risks which are ordinarily incidental to his employment as well as those dangers which are plain and obvious to a person of ordinary understanding and judgment. Therefore, if this incident and the resulting injury arose out of the plaintiff's employment as a checker and not any negligence on the part of this defendant, you must find your verdict in favor of this defendant, of no cause for action.
10. If you find that it was the plaintiff's responsibility to see that the cargo was properly broken down and delivered, and that plaintiff controlled the method and manner in which the work was to be done, and the injury to plaintiff resulted from the manner in which the work was performed, your verdict must be in favor of the defendant of no cause for action."
There was no specific request by defendant to charge the elements of contributory negligence. It insists that the foregoing requests submitted by it are sufficiently specific to include a request to charge the law applicable to contributory negligence. We find to the contrary.
Initially, we observe that although authority may be found for the proposition that the doctrines of contributory negligence and assumption of risk are identical such is not the law of this State. Ford v. Reichert, 23 N.J. 429 (1957); Klinsky v. Hanson Van Winkle Munning Co., 38 N.J. Super. 439 (App. Div. 1955), certification denied 20 N.J. 534 (1956); Hendrikson v. Koppers Co., Inc., 11 N.J. 600, 607 (1953). Defendant's request that the trial court charge the jury concerning assumption of risk did not, therefore, include therein a request to charge the concept of contributory negligence. No such request having been presented *572 by defendant nor any exception taken to the court's failure otherwise to charge with reference to the question of contributory negligence, defendant's present criticism of the trial court's failure to charge the elements of contributory negligence is without merit. We find no justification for invoking R.R. 1:5-3(c); R.R. 2:5.
The defense of assumption of risk in the case at bar was raised by the answer and preserved in the pretrial order. The facts rendered appropriate and necessary a charge referring to that concept.
Plaintiff's discharge of his duty as a checker for American placed him in the vicinity of the piled cargo as it was being moved at the time of the accident. The cargo which was being discharged consisted of bags of coriander seed, and plaintiff was checking them as they were being removed from the pile. He knew that men sometimes removed the dunnage by hand, sometimes by use of a box hook or longshoreman's hook. He did not know how Parisi pulled out the particular plank. He did not see Parisi move it. Parisi described the happening of the accident as follows:
"The job was going along nicely. I went to pick up some dunnage, because the stevedoring, when they load cargo on the pier, they generally put dunnage on the floor to keep it dry, you see. So after you run three to four tiers out, to prevent the truckers from going over to the dunnage and hurt themselves, we generally  the loaders like myself and Frank Baumann  we pick the dunnage up so we make room for them to come in.
So that particular day I went down and bent down to pick up a piece of dunnage. You know what I mean by dunnage. They run in all sizes, and I picked it up and as I was coming around facing Frank Lawton, it slipped and it struck him. It was a real hard blow; I know it. He sort of buckled down, I guess from the pain.

* * * * * * * *
Q. You don't know approximately how much this piece of dunnage weighed, do you? You know it was heavy? A. It's hard. I mean I could give any figure but I could be wrong.

* * * * * * * *
Well I could say it's thirty pounds, forty pounds, twenty pounds. This particular piece I would say would be roughly, maybe, thirty pounds.

* * * * * * * *
*573 Q. What height was it? A. Height? It's over my head. I have to give you an example. We're working inside of something. There's cargo here and there's cargo here. They sometimes lay the dunnage all the way across, so the piece you got to take out is longer than the square you are working in. Follow me? So to get this piece out you sort of have to drag it out to make room. Then to get it out you have to raise it because there's no other way of getting it out. It's like you have to catty-corner it out. That's the way you come out with it, like that.
Q. As you dragged it out, Mr. Parisi, did you use your hands or any instrument in dragging it out? A. All we generally use  we have hooks. We carry hooks with us. If you can't get your fingers under it you get it with the hook. That will give you a little room to get your fingers under it, your hand, then you generally either put the hook in your back pocket or throw it on the floor, whichever is easier for yourself. Then you bend down with your two hands and you start to drag your dunnage. You use two hands to pick something up.
Q. The dunnage itself, would you say it had any covering on it, such as moisture or anything like that? A. You take any piece of dunnage, after it has been in the dock for a while it generally picks up a lot of grease and oil. Machines are always going back and forth. A lot of them drip wet cargo. You get wine and different kinds of liquors. Then you have some bags that leak. Naturally, you walk on top of it and you get maybe garlic or something like that. You step on the cargo, it goes on to the dunnage and makes it slippery. You may handle the garlic all day or something.

* * * * * * * *
Q. Did Mr. Lawton know that you were taking the dunnage out? A. No, I don't think he knew.
Q. You don't know? A. I say I'm sure he didn't know.
Q. Why are you so sure that Mr. Lawton did not know that you were taking the dunnage away? A. Because at that time when I was  well, like I say I was picking this piece up. As I was walking with it he was into his book, his checker's pad, and he was probably either counting  I can't say what he was doing. He was either counting how many more remained or how many he sent down or something like that, and he couldn't have been watching me.
Q. Did he have his back to you? A. He was on the side. He couldn't see me, the way he was standing. He couldn't see me until I got past him if he looked up.
Q. Do I understand that after you get your hook in this and you pull it out, then you lift it up with your hands up to, I think you indicated, the height of your shoulder? A. Sometimes as high as that.
Q. What did you do on September 23, 1954? A. I would say up to my shoulder, yes, sir.
Q. You had it up to your shoulder? Is that where you had it? A. That's right.
*574 Q. Then what happened? A. Like I say, I walked it out  I'm walking it and getting it outside to make room.
Q. Then what happened? A. Well, Mr. Lawton was standing there, as I said, and as I picked it up, I would say I was going to my left. I'm crossing past him, as I stated before, and it slipped out of my hand and hit his foot, and he fell, of course, * * *."
Mr. Baumann described the accident as follows:
"Q. Will you tell us what you did on this day in question? A. Yes. Mr. Lawton came up and Mr. Manning said, `Here's a job for you.' We went down, Judge, your Honor, and we started loading the bags. I ain't sure whether we loaded three or four on the handtruck. Well, as we loaded them we go in further and further. So, naturally, we pulled the dunnage out. As we were pulling this dunnage out, Mr. Lawton was tabulating. In other words, he puts down, like, three bags, and tabulates. He's got to tabulate what leaves the dock. So, I turn around and this piece of dunnage or wood, as you call it, fell down and it didn't fall that way, Judge, your Honor, it fell that way, and it hit Frank on the toe and he, like, collapsed. * * *"
Although under the facts above recited a jury might be completely justified in concluding that plaintiff should not be denied recovery by the application of the doctrine of assumption of risk, the request to charge should have been honored and the jury afforded an opportunity to pass on this phase of the case. Klinsky v. Hanson Van Winkle Munning Co., supra. The doctrine, though usually applied to the relationship of master and servant, may be used in other fields. "No matter where applied, the doctrine may involve no fault or negligence, but rather entails the undertaking of a risk of a known danger." Hendrikson v. Koppers Co., Inc., supra, 11 N.J. at page 607.
The court's refusal to charge the request constitutes reversible error.
Defendant further asserts that the trial court erred in failing to define the terms "direction" and "control" in its charge to the jury. Defendant specifically criticizes the court's refusal to charge certain requests bearing on those elements.
*575 The requested charges were as follows:
"3. On the proofs in this case, all the defendant, Virginia Stevedoring Corporation, was required to do was to supply extra labor or men to American Export Lines when authorized, as stated in the contract.
4. The obligation to move or deliver the cargo on Pier F, at the time of the incident, was upon the plaintiff and his employer, American Export Lines, under its contract with the defendant stevedoring company.
5. The injury complained of by plaintiff occurred during the moving of cargo known as a loft or terminal operation. If you find that the plaintiff, through its employer, American Export Lines, directed and controlled this operation and gave orders to Parisi & Baumann, your verdict must be in favor of the defendant, no cause for action.

* * * * * * * *
7. If you find that Virginia Stevedoring Corporation did not agree that it, itself, should perform the loft labor operation through servants of its own selection, retaining the direction and control of them, your verdict must be a verdict in favor of defendant, no cause for action.
8. If you find that the furnishing of workmen by Virginia Stevedoring was merely for the accommodation and convenience of American Export Lines, and that the act in question was done in the business of American Export Lines of which it had control as a proprietor, and that American Export Lines, through its own employees, could at any time stop the work or continue it and could determine the way it should be done, not only as to the result to be reached, but as to the method of reaching the result, your verdict must be in favor of the defendant, no cause for action.

* * * * * * * *
11. The relationship of master and servant exists whenever the employer retains the right to direct the manner in which the business (work) shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done. If you find from the evidence and proof in this case that on the date of the accident American Export Lines retained the right to direct the manner in which its business (work) was to be done by the members of the loft gang, as well as the result to be accomplished, even though the members of the loft gang were on the payroll of and paid by Virginia Stevedoring Corporation, your verdict must be in favor of the defendant and against the plaintiff, a verdict of no cause for action.
12. Payment of wages for the time worked, in and of itself, is not sufficient for concluding that the members of the loft labor crew were employees of the defendant, Virginia Stevedoring Corporation, at the time of the occurrence, nor does that fact alone render the defendant in this case liable for the alleged injuries sustained by the plaintiff.
13. The mere fact that an employee is the general servant of one employer does not, as a matter of law, prevent him from becoming the particular servant of another, who may become responsible for *576 his acts. In determining whose servant he is, the general test is whether the act is done in the business of which the person is in control as a proprietor so that he can at any time stop or continue it and determine the way in which it shall be done, not merely in reference to the result to be reached, but in reference to the method of reaching the result. Under this test, if you find from the facts produced in this case that the act in question was done in the business of American Export Lines and that the latter was in control as a proprietor so that it could at any time stop or continue the work and determine the way it should be done, your verdict must be in favor of the defendant and against the plaintiff, a verdict of no cause for action."
The court, however, charged another of the requests submitted by appellant with reference to the phases of direction and control as follows:
"6. If you feel that under the agreement in evidence, that the defendant, Virginia Stevedoring Corporation, merely furnished the American Export Lines with men to do the loft labor and that those men were placed under the exclusive control and direction of American Export Lines employees in the performance of the work, then the men in the loft labor became, for the time being, the servants of American Export Lines to whom they were furnished. In that case, American Export Lines, to whom the workmen are furnished, is responsible for the conduct of those workmen because the work is American Export Line's work, and they are, for the time, its workmen, and Virginia Stevedoring Corporation would not be responsible for their negligence."
Plaintiff contends that the last quoted request amply covered the subject of direction and control and that no error was committed by the trial court in refusing to charge the aforesaid remaining requests or in not more specifically outlining the elements to be considered by the jury on that subject.
One of the most important issues in the case was the determination by the jury of the status of Parisi. Was he at the time of the accident an employee of Virginia or of American? We are in accord with the trial court's ruling that this was a jury question to be decided by it from the facts within the legal principles to be outlined to it by the court, and that the trial court properly denied the motions of defendant for an involuntary dismissal at the end of *577 plaintiff's case and a judgment of dismissal at the end of all of the testimony.
Plaintiff contends that the overwhelming evidence demonstrates that Parisi was an employee of Virginia, and he emphasizes the testimony of Lawton, Baumann, Manning, Abbate and Parisi in contrast with the testimony of defendant's witness Main. Even if we were to assume the validity of that argument, it does not reach the vital question here urged by the defendant. The jury was called upon to consider the aforesaid contract between American and Virginia and to assess the evidence bearing on the specific activities of the various men working under the contract. Plaintiff urges that the court's charge amply presented the issue to the jury.
We cannot agree with this contention in view of the decisional law applicable to cases of this type. It was requisite under the law of this State that the terms "direction" and "control" be explained by the court to the jury in relation to the evidence adduced on that subject in order that the jurors might "fully understand the line of their duty and how to perform it." Brumberger v. Burke, 56 F.2d 54, 56 (3 Cir. 1922), cited with approval by the court in Kreis v. Owens, 38 N.J. Super. 148, 156 (App. Div. 1955), in a case dealing with a question of proximate cause where "the factual setting of the case made the problem of causation of great importance." The court should not have limited its charge on this subject as it did by charging only request number six aforesaid and not otherwise curing the omission.
The determination of the issue of employment by the jury rendered it imperative that the trial judge give adequate instructions for the jury's guidance. He failed to define or explain the meaning of the terms "direction" or "control." His charge included the following:
"Now, this is not a very difficult case, it seems to me, to determine. This is an action instituted by Mr. Franklin M. Lawton against the Virginia Stevedoring Co. Now, it is your recollection of the evidence and your memories which control in your deliberations, so that any statements that Counsel may have made in the summations, or the Court, you should refer to the record. If it does not coincide with *578 your recollection, you must be guided solely and entirely by your own recollection of the proof.
Now, briefly, the Plaintiff, Mr. Lawton, on the morning of September 23, 1954 was employed as a checker by the American Export Lines on Pier F in Jersey City. While working there as a checker on certain bags, that an employee of the Virginia Stevedoring Co., a Mr. Parisi, and also another gentleman, Mr. Bauman, were working there also. The Plaintiff contended that he was sent by the hiring boss of the Stevedoring Co., Mr. Manning. Mr. Parisi had a piece of dunnage, board, and this board fell from the hand of Parisi and struck the Plaintiff in the left foot causing him to fall to the concrete floor of the pier. The Plaintiff sustained injuries to the frontal part of the head and there was bleeding at that time, and as a result of the negligence of Mr. Parisi, Mr. Lawton claims that he sustained, he now claims and seeks damages at your hands. The Plaintiff also contends that Mr. Parisi was an employee of the Virginia Stevedoring Co. The Plaintiff's contentions are simple, aren't they?
The Defendant, the Virginia Stevedoring Co., by way of defense, contends first that Mr. Parisi was not an employee of it at that time. Their contention was that he was an employee of the American Export Lines and further they contend that even if he were an employee of the Defendant Company, which would make them responsible for the accident of this employee, that Mr. Parisi was not negligent. Then, of course, there are contentions as to what the injuries were, that the Defendant interposes by way of defense, as to what the Plaintiff's injuries really consisted of. Now briefly, that in effect is what the Defendant contends.
As your jurors contemplate the evidence in the case you will find there is contradictory evidence. The only one who offers contradictory evidence as to the employment of Mr. Parisi, is the Captain who was the superintendent of the Virginia Stevedoring Co. at the time. He is the only one and [who?] questions that and denies that Mr. Parisi was working for the Virginia Stevedoring Co. Mr. Manning said that he was and that he elected these men because there was an agreement between these parties. You will have the agreement with you in the jury room and it will indicate to you just what arrangements the American Export Lines had with Mr. Parisi at the place where the accident happened on the morning in question.
Now, that is contradictory evidence. You must determine where the truth lies; who are you going to believe? In so doing you ask yourselves the question of whether or not any of these witnesses had an interest in this case, the demeanor and credibility of the witnesses and bearing in mind, with respect to truthfulness, if you find that a witness swore falsely to a material fact, you will disregard that testimony. It is the credibility, the truthfulness of the witness, that determines the weight of the evidence, not necessarily the number of witnesses who have testified for one side or the other.

* * * * * * * *
*579 Now, in passing upon the status of Mr. Parisi, you must consider all the evidence that you have heard on that question as to whether he was under the sole control of the Defendant and then, of course, if not, the Plaintiff cannot recover. If you find that Mr. Parisi was an employee of the Virginia Stevedoring Co., then, of course, you would go on then to consider the second question as to whether or not the negligence of Mr. Parisi was the proximate cause of Mr. Lawton's injuries and the damage which he seeks to be compensated for.

* * * * * * * *
If you determine from all the evidence, either that Mr. Parisi was not an employee of the Virginia Stevedoring Company or that Mr. Parisi was not negligent, then in either of those two events your verdict would be in favor of Virginia Stevedoring Company, `no cause of action.'
If you determine in your deliberations that Mr. Parisi was an employee of the Virginia Stevedoring Company and his negligence was the proximate cause of Mr. Lawton's injuries and damage, then you will find a verdict in favor of the Plaintiff, Mr. Lawton and against the Virginia Stevedoring Company."
In Devone v. Newark Tidewater Terminal, Inc., 14 N.J. Super. 401, 405 (App. Div. 1951), the court said:
"It was held in the early days that the negligence of one in the position of Johnson, the engineer, could not be imputed to Dade, but must be imputed to Tidewater Terminal, unless the relation of master and servant had arisen between Johnson and Dade. Laugher v. Pointer, 5 B. & C. 547; 108 Eng. Repr. 204 (K.B. 1826): New York L. & E.W.R.R. Co. v. Steinbrenner, 47 N.J.L. 161 (E. & A. 1885). To solve the issue of liability, inquiries were made that would be pertinent if the alleged change of employment was permanent: Who paid the wages? Who had the right to discharge the servant? Did the servant consent to the change of masters? This was approximately the position taken by Justice Minturn, and the majority of the court in Courtinard v. Gray Burial, etc., Co., 98 N.J.L. 493 (E. & A. 1923). But Judge White, concurring in the result, put aside such questions and expressed the opinion that it is the control or right to control which fixes the liability. The terms `general employer' and `special employer' have come into use, but it will be observed the special employer is not really an employer in the ordinary sense. Rather, he is one who temporarily controls the activities of another man's servant. Busch v. Seaboard By-Product Coke Co., 100 N.J.L. 304 (E. & A. 1924), advances toward Judge White's position so far as to hold that the important test is that of control of the servant's actions. This test becomes not merely the important one, but decisive in Lacombe v. Cudahy Packing Co., 103 N.J.L. 651 (E. & A. 1927), and Errickson v. F.W. Schwiers, Jr., Co., 108 N.J.L. 481 (E. & A. 1932). These two cases further *580 establish that the control which is meant is ordering not only what shall be done but how it shall be done. We are satisfied that this is the law of New Jersey."
The appellate court found no error in the trial court's refusal to charge as requested in the cited case, but held that when appellant called attention to the court's failure to charge what constitutes control the court should have amplified that part of the instructions. We note, also, that the question of the elements constituting direction and control has received frequent consideration by our courts. Falk v. Unger, 33 N.J. Super. 589, 593 (App. Div. 1955); Sarris v. A.A. Pruzick & Co., 37 N.J. Super. 340 (App. Div. 1955); Larocca v. American Chain and Cable Co., 13 N.J. 1, 6 (1953).
In the case at bar the court's failure to explain the elements of direction and control requires reversal.
Defendant contends that the trial court's questioning of defendant's witness Douglas W. Main exceeded the court's privilege and prejudiced defendant. It asserts the same adverse effect with reference to certain comments by the court made while the same witness was testifying.
This interrogation of the witness covers approximately six pages of the printed record. Our examination of the transcript of the criticized questioning convinces us that no justification exists for defendant's contention that the judgment should be reversed by reason of such action by the court. It has long been recognized that the trial judge may participate in a trial by the interrogation of a witness. Polulich v. J.G. Schmidt Tool Dye & Stamping Co., 46 N.J. Super. 135, 143 (Cty. Ct. 1957); State v. Manno, 29 N.J. Super. 411, 417 (App. Div. 1954); State v. King, 133 N.J.L. 480, 483 (Sup. Ct. 1945), affirmed 135 N.J.L. 286 (E. & A. 1947); Highway Trailer Co., Inc. v. Long Branch Auto Co., 114 N.J.L. 317, 319 (E. & A. 1935). However, such participation by the judge must not exceed the bounds of judicial propriety. State v. Riley, 49 N.J. Super. 570, 582 (App. Div. 1958). We find no reversible error in the court's interrogation of the witness *581 Main nor in the statements the court made during such interrogation.
Defendant next contends that the court committed prejudicial error in charging the jury as follows: "If you find that a witness swore falsely to a material fact, you will disregard that testimony."
Defendant contends that (a) unless the court had good reason to believe that a witness testified falsely and willfully for the purpose of deceiving the jury the administration of justice would not require him to charge the doctrine falsus in uno, falsus in omnibus, citing Hargrave v. Stockloss, 127 N.J.L. 262, 266 (E. & A. 1941); (b) the charge invaded the province of the jury in that it gave the jury a mandate to disregard all of the testimony of any witness who testified falsely as to any material fact, despite the fact that the doctrine is permissive rather than mandatory, citing State v. Wesler, 137 N.J.L. 311 (Sup. Ct. 1948); (c) the instruction was prejudicially harmful as it failed to draw a distinction between testimony given by a witness contrary to fact where the witness believed the testimony to be true and a situation where the untruth was willfully told, citing Abraham v. Wilson & Co., 121 N.J.L. 530, 533 (E. & A. 1939); Anthony v. Public Transit Co., 3 N.J. Misc. 1204, 1206 (Sup. Ct. 1925) not officially reported.
We are in accord with these contentions of defendant. Failure of the trial judge to observe the decisional law applicable to this subject requires reversal.
As the judgment in this case has to be reversed and a new trial ordered for the reasons herein set forth, it becomes unnecessary for us to discuss the remaining points raised by defendant, including the contention that the verdict was against the weight of the evidence and excessive.
The judgment is reversed and a new trial ordered, costs to abide the outcome.