SARA B. McKINNEY, ADMINISTRATRIX AD PROSEQUEN-
DUM OF THE ESTATE OF ROBERT H. McKINNEY, DE-
CEASED, PLAINTIFF-APPELLANT, v. PUBLIC SERVICE
INTERSTATE TRANSPORTATION COMPANY, A CORPO-
RATION OF THE STATE OF NEW JERSEY, DEFEND-
ANT-RESPONDENT.

Argued February 20, 1950—Decided March 27, 1950.

230

Mr. *Weidner Titzck* argued the cause for appellant. Mr. *Walter S. Keown* on the brief.

Mr. *Herman H. Wille, Jr.,* argued the cause for respondent (Mr. *Carl T. Freggens,* attorney).

The opinion of the court was delivered by

CASE, J.   The single question is whether the court erred in dismissing the complaint after plaintiff had closed her case on negligence.

Plaintiff's intestate, Robert H. McKinney, had been a passenger on defendant's bus.  At about one o'clock in the morning of November 27, 1947, the bus stopped on White Horse Pike at the intersection with Beechwood Avenue, Oaklyn, New Jersey.  The summary of what transpired is stated in appellant's brief thus:

"After the last passenger was observed getting off the bus, the driver pulled away from the stop and in a matter of seconds a bump was felt by almost all of the witnesses when the right rear wheel of the bus was felt to go over an object.  The bus was stopped. Upon examination most of the witnesses agree that said last passenger was found dead lying parallel with and in the gutter on White Horse Pike with his head pointing south."

The bus had drawn up to the curb, the front close to the curb, the back at a distance from the curb variously testified to have been from one foot to four or five feet. Three passengers, men, alighted; Judd, Fred Kampmeyer and the decedent. Judd died between the time of the accident and the date of the trial; consequently his testimony was not available. Nothing unusual appears to have attended his leaving the bus. The second man to get off was Kampmeyer, who, as he was getting off, saw a man ahead of him walking around the rear end of the bus. It was conceded that the last mentioned person was Judd. Kampmeyer testified that the front of the bus was close to the curb and that so far as he knew he stepped directly from the bus to the pavement. Appellant's suggestion that the decedent, McKinney, was the third and last passenger to alight is consistent with the proofs. One of the witnesses said that when the bus started the door was not entirely closed, but there is no evidence that that incident was or could have been a factor in the accident; indeed, the witness further testified that she saw the decedent get off the bus and that he was not on the steps when the bus started. The bus pulled away from the curb. After a short interval, described as "right away," "a few seconds," "a few feet," there was a jolt which was conceded at the argument to have been the movement of the bus in passing over the decedent's body. The rear of the bus had double wheels, which, on the right side, passed over the body. Following that jolt or bump the bus was stopped half-way across the Beechwood Avenue intersection, an inspection was made and the body was discovered in the position described above. Other details of the evidence will be discussed in the course of the opinion.

Appellant first invokes the provisions of the two statutes as follows:

*R. S.* 39:4–65. "No operator of a vehicle shall stop the vehicle on the highway for the purpose of letting off or taking on a person, other than at the curb or side of the road or highway, or knowingly permit a person to alight from or enter upon the vehicle while it is in motion."

*R. S.* 39:4–68. "No operator of a street car or autobus shall knowingly operate the same while any door thereof is open."

The testimony does not support the inference that an open door was a causative factor. The stopping was at the curb on the side of the road or highway. There is no proof that there was an appreciable space betwen the car-step and the curb. Nor is there proof that the passenger alighted or attempted to alight while the vehicle was in motion, much less that the driver knowingly permitted that to be done.

■■ Appellant does not charge a specific act or omission as being the proximate cause of the accident. Her brief has ten numbered paragraphs containing matter which she alleges would, in relation to the whole testimony, have justified the jury in inferring negligence had the case been submitted. We shall follow the plan of the brief and state, and comment upon, that series of numbered paragraphs.

> "(1) The decedent was a passenger on the defendant's bus and alighted therefrom at the corner of Beechwood Avenue and White Horse Pike in Oaklyn."

That proposition is conceded.

> "(2) The driver of the bus had swerved into the curb at a sharp angle."

There is no proof of a "sharp angle" except as follows. The testimony of the witness Standen is that the bus in making its stop went "up to the curb and pulled sharp into the curb," and he explained this by saying that while the front was pulled into the curb the rear of the bus was "four or five feet" out. The witness Cleaver, in answer to the question "How did it (the bus) get to the curb when it came to a stop?" testified, "It made a turn and the front of the bus came to the curb." The witness further said that the rear of the bus was farther away from the curb than was the front, but she gave no suggestion of how much farther. The witness Hughes gave this testimony:

> "It swerved in from the highway and stopped on the right-hand corner of Beachwood Avenue, the bus stop.
> "Q. Can you estimate how far the front door or steps were from the curb?

"A. No, sir.

"Q. Was the front of the bus nearer or farther away from the curb when it stopped?

"A. The front of the bus was nearer to the curb."

The witness Fauver, a fellow passenger, testifying of the driver's approach to the stop, said: "He pulled into the curb, and his rear, I would say, was about one foot from the curbline, but his front was right at the gutter, the curb, rather." We find nothing in that or other testimony from which it may fairly be inferred that the front of the bus from which the decedent made his exit was not safely located for the discharge of passengers. The door from which the exit was made was at the very front of the vehicle, with nothing beyond except the enclosing wall. It was in front of the front wheel. The engine was at the rear. The bus was thirty feet long, but there was a much less distance between the front and the rear wheels. The front wheels were in back of the front doors and the rear wheels were in front of the engine and just behind the side doors. The wheels, both front and rear, are shown by the photographic exhibits to be recessed under the side of the vehicle. There was something in the way of a rubber fender protruding one and one-half inches. The construction of the bus being as it was it is not apparent how the front right wheel could have come to the curb or been against the curb without placing the step in convenient location with respect thereto.

> "(3) The door of the bus stopped and the body of decedent was found in gutter of White Horse Pike very near the corner of Beechwood Avenue and White Horse Pike close to a telephone pole and approximately 15 feet south from the bus stop sign."

The body was found between the pole and the bus-stop sign, if it be understood that the body was in the gutter and the two erections were on the other side of the curb in the sidewalk space. We do not grasp the meaning of the words "The door of the bus stopped." The proof is not that the body

was found at the precise spot where the door had been. The whole action occurred within a limited area.

"(4) The decedent was the third and last man to get off the bus at the corner in question, and the driver of the bus did not see more than two people alight."

That is true, but it is not shown to have been part of the driver's duty to count the number of passengers who got off. There is no element of actionable negligence in the suggested omission. There may be some significance in the testimony of the witness Weatherford that the first two men to get off "were very close together" and the third man was not "as close."

"(5) The bus was started very quickly; thus, Mrs. Cislo testified that the bus lost no time in having pulled away from the curb and Dorothy Cleaver indicated that when the last man was getting out the bus started up right away, and the driver of the bus claimed that he had stopped the bus as quickly as possible after the bus ran over the decedent's body, but the rear of the bus was then half across Beechwood Avenue."

The bus had stopped originally in such a position that the front was at the street corner. The distance from there across the intersection—the rear of the bus was half way across the intersection when the bus stopped following the jolt or bump—was not great. The jolt to the bus was not instantaneous notice that the reason for it was the later discovered fact, and we read no controlling import in the traveling of those few feet. The testimony imputed to the witnesses would not support a finding of negligent driving. It is not made clear what effect the speed of the bus, after the passenger had alighted, would have in causing the accident. There is no proof that he had not left the car and there is positive evidence that he had.

"(6) Immediately after the bus started the bump was felt."

"(7) When the driver started the bus after the decedent alighted therefrom, the door was only half closed."

We have already commented upon the matters stated under numerals 6 and 7.

"(8) The decedent's coat was not torn when he was on the bus."

"(9) The decedent's coat, torn in the right sleeve, was introduced in evidence as Exhibit P-4 and identified as having been the coat decedent was wearing on the night of his death."

"(10) An examination of the bus within a comparatively short time after the tragedy disclosed that, on the right side of the bus, the side where the passengers alight, there was a metal flap, which was protruding and which, when pushed down, would immediately fly up again, so as to be protruding from the side of the bus to an extent of approximately six inches."

The matters under the numerals 8, 9 and 10 have relation to the following circumstances: On an undisclosed date the decedent's clothing was delivered by the undertaker to a member of the decedent's family. The well-worn coat then had a tear in the right sleeve which had not been there before the accident. A son of the decedent testified, over objection, that sometime on March 28th he had examined the outside of the bus at some point on a highway and observed that the metal flap over the gas intake was protruding at about right angles, approximately six inches from the side of the bus, and that when he pushed it down it sprang back. The contention is that the tear in the sleeve of the coat indicates that the protruding metal flap might have caught and thrown the deceased. The argument is too tenuous. The testimony of the police officer who came to the scene of the accident clearly and without contradiction showed that the rear wheels had passed over and crushed the man's body and head and that the "terrible pressure or something" had "busted the clothes

out," that the pants were torn and pulled open across the haunches of the body. The traction and weight of the large rear double wheels, crushing and mutilating the man's body and clothes, give adequate explanation of the torn sleeve. The suggested theory is without support either in the direct proofs or in the inferences legitimately to be drawn therefrom. At the most the torn sleeve is but a mere scintilla of evidence and as such insufficient to carry the case to the jury. *Baldwin v. Shannon*, 43 *N. J. L.* 596 (*Sup. Ct.* 1881); *Timlan v. Dilworth*, 76 *N. J. L.* 568 (*E. & A.* 1908); *Habedank v. Atlantic Casualty Ins. Co.*, 128 *N. J. L.* 338 (*E. & A.* 1942).

The question has been raised whether the testimony of the bus driver in saying that he saw the last passenger "midway between," "on the cement," would sustain a factual finding that when he stopped the bus for the passengers to alight the bus entrance was far enough from the curb to cause a passenger to step down on the street pavement, or that the decedent when he got off stepped down into the roadway. The testimony does not support either of those conclusions. White Horse Pike runs north and south, and the bus was proceeding southwardly. It stopped at the near or northerly corner of Beechwood Avenue. Westerly from the bus or from the curb is the direction to the right of the bus, away from the Pike on which the bus was traveling and toward the property lines adjoining the sidewalk. A passenger in going westerly would be going to the right of and away from the bus; in going southerly he would be going in the same direction as was the bus; in going northerly he would be going in the opposite direction from that in which the bus was headed. The sidewalk space along and to the west of the Pike curb was not completely paved from curb to property line. Sometimes the entire sidewalk space, sometimes only the strip paved for walking, is referred to as the "sidewalk." The general terrain westerly from the roadway of the White Horse Pike where the bus stopped was, first, curb; second, dirt; third, the paved way; fourth, property line. Immediately at the corner, however, the cement or concrete pavement of the sidewalk was brought down, as is frequently the case at street corners,

to the curb. And it was at that cement sidewalk extension that the passengers were discharged. At the north end of the cement sidewalk extension was a large pole, called a "telephone" pole, or a "Public Service" pole. Beyond that and running between the curb and the sidewalk pavement, but still in the sidewalk space, was dirt. Then came an erection called the "bus-stop sign." The distance from the street intersection to the "bus-stop sign" was, roughly, fifteen or eighteen feet. There is some confusion in the testimony as to whether the large pole was at the south end or the north end of the cement sidewalk extension, but that uncertainty has no material effect upon the issue; and with that exception the street and sidewalk conditions are clear.

Holl, the coroner of the County of Camden, who was on the scene before the body was moved, says this:

"* * * there is a pole, as I remember it, in the vicinity of the corner of that intersection, alongside of which there is a short piece of concrete, and in going north from that is dirt, which would normally be the space between the sidewalk and the curb. About 7 or 8 feet back of this short piece of concrete, between the pole and this dirt, this man's body lay in the gutter, face up, head towards Atlantic City. I guess that is south."

We have already reviewed the testimony of eyewitnesses other than the driver regarding the relative position of bus-stop and curb.

Now, as to whether or not the testimony of the driver is susceptible of the suggested adverse construction. The pertinent portions of his testimony follow:

"Q. You say the body was approximately 12 feet south of the bus stop sign, is that correct?

"A. That is correct.

"Q. The map, unfortunately, does not show the bus stop sign, but do you have any idea how far it is from the pole which is on the corner?

"A. Approximately 15 feet.

"Q. So, if the scale—(interrupted).

"COURT: Will you have that explained, in which direction?

"Q. That would be north of the pole?

"A. North of the pole.

"Q. Indicating somewheres in the area north of the pole on the westerly side of the White Horse Pike, is that correct?

"A. Yes, sir.

"Q. The bus stop sign is located approximately 15 feet from the pole?

"A. That is correct.

"Q. The bus stop area is located in your mind—am I right—in this vicinity up to and including the pole?

"A. That is right.

"Q. When the bus is brought to a stop in that vicinity, where is the bus stop in relation to the pole and end of the concrete which is marked on the northwest corner by line running westwardly from the curb?

"A. I had in mind between the pole and the north line of that cement.

"Q. So that you were asked in the statement as to whether the man was lying at the bus stop. You mean he was in the bus stop area?

"A. Yes, sir.

\*        \*        \*        \*        \*        \*        \*        \*

"COURT: Now, you are asking where he got off.

"MR. WILLE: No. If your Honor please, the witness testified that the body was found approximately 12 feet from the bus stop sign.

"COURT: And he says that this cement block is how long? Has he said that?

"MR. WILLE: He said 15 feet from the bus stop sign, as I recall. That is the cement block I am pointing to, just north of the pole.

\*        \*        \*        \*        \*        \*        \*        \*

"WITNESS: Your Honor, I can't explain what this man done, but in the operation of the bus, I was coming into Beachwood Avenue bus stop, and someone called Beachwood Avenue. I pulled to the curb. At Beachwood Avenue, at this point, there is just that space between the pole and the end of the sidewalk where some-one can get off the bus safely. From the point of that sidewalk back to the bus stop sign. At one time it was cobble-stones. At that time it was mostly hills, a few cobbles here and a few cobbles there. Therefore, that was the actual bus stop, this space between the pole and edge of the sidewalk. I pulled in there.

"COURT: How close?

"WITNESS: Right to the curb so that they could step right on the sidewalk. There was absolutely nothing to keep me away from it. When the passengers got off the bus, they were clear.

"COURT: Did you watch them?

"WITNESS: I watched them. They were clear of the bus. I closed the door and started the bus.

"COURT: When you say 'clear,' what do you mean?

"WITNESS: By that I mean one man I saw on the sidewalk and another man was almost to the White Horse Pike sidewalk, that is a distance of three to four feet from the bus.

"COURT: You mean toward the building line?

"WITNESS: Westwardly toward the building line.

"COURT: Where was the last man?

"WITNESS: Toward the bus. He was about 2 feet from the bus.

"COURT: On the sidewalk?

"WITNESS: Midway between.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Q. How close did you say your door, or the space leading from it to the sidewalk?

"A. Matter of one or two inches.

"Q. Then you pulled your bus—steered your bus to the left when you started?

"A. As I am leaving, you turn to the left to pull away from the curb.

"Q. Didn't you look to see whether there was anybody alongside the bus, or make any observation at all in that direction?

"A. Through the door, sir, is all you can see at night.

"Q. I am not asking you that. I am asking you if you looked.

"A. I did, yes, sir.

"Q. What did you see?

"A. I saw the last man who had gotten off the bus about 2 feet away, walking west. His back was to the bus.

"Q. Walking away from the bus?

"A. Yes.

"Q. That was on the cement?

"A. Yes.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Q. When you saw this last man off the bus, you say he was 2 feet away from the bus, walking west?

"A. Yes, sir.

"Q. Was the bus door open or closed when you made that observation?

"A. Open.

"Q. What did you do after making that observation?

"A. I closed the door and started the bus."

■ It is clear that the bus driver, when he testified that he saw the last man "about 2 feet from the bus," "midway between," "walking away from the bus on the cement," was not referring to the highway or to cement in the highway or to any point within the limits of the roadway but was speaking of a spot inside the curb on the cement or concrete sidewalk extention, the regular point of discharging passengers at that location, that being a part of the sidewalk space between the curb and that regular pavement where pedestrians proceeding along the Beechwood Avenue sidewalk ordinarily

walked; midway between the curb and the continuous Beech-
wood Avenue sidewalk pavement. There is no testimony to
justify an inference that the place of stopping did not fulfill
defendant's responsibility to seek a safe place for that pur-
pose or that the decedent had not alighted safely, or that
decedent was thrown from the car-step by improper manage-
ment of the bus or that the man's clothing had been caught
by a protruding flap on the gas intake. Those are the con-
clusions which the appellant contends the jury might have
reached by inference.

The decedent had been a passenger and after he left the
bus he was crushed to death beneath the rear right wheels of
the vehicle. But that tragic manner of death may not be
taken as proof of negligence. There must first be proof, or
the opportunity for direct inference from proof, of some act
or omission of the defendant which was the proximate cause
of the accident. There are possible causes arising from the
decedent quite as probable as those emanating from the de-
fendant; the decedent may have fallen; he may have become
confused at that very late hour and walked into the bus. It
is easy to indulge in imagination, but imagination is not a
legal way of arriving at liability.

The mere showing of an accident causing the injuries
or death sued upon is not alone sufficient to authorize an
inference of negligence; negligence is a fact which must be
shown; it will not be presumed. *McCombe v. Public Service
Railway Company,* 95 *N. J. L.* 187 (*E. & A.* 1920); *Church
v. Diffany,* 124 *N. J. L.* 100 (*E. & A.* 1939); *Oelschlaeger v.
Hahne & Co.,* 2 *N. J.* 490 (1949). To establish a case of
negligence and fix liability upon a defendant it is incumbent
upon the plaintiff to prove some fact which is more consistent
with negligence than with the absence of it. *Alvino v. Public
Service Railway Co.,* 97 *N. J. L.* 526 (*E. & A.* 1922); *Grugan
v. Shore Hotels Finance and Exchange Corporation,* 126 *N. J.
L.* 257 (*E. & A.* 1940).

It is further contended that the trial court erred in
failing to apply the doctrine of *res ipsa loquitur* to the evi-
dence adduced. That maxim was defined thus in *Mumma*

*v. Easton and Amboy Railroad Company,* 73 *N. J. L.* 653 (*E. & A.* 1905):

> "This principle is that when through any instrumentality or agency under the management or control of a defendant or his servants there is an occurrence, injurious to the plaintiff, which, in the ordinary course of things, would not take place if the person in control were exercising due care, the occurrence itself, in the absence of explanation by the defendant, affords *prima facie* evidence that there was want of due care."

The central incident of the case now under review, namely, the movement of a public bus along a highway, is not such an occurrence as, in the ordinary course of events, would not take place. The act was injurious. It resulted in a fatality. But the act itself, the propulsion of the vehicle along the highway, was entirely regular. To cite a few cases for illustration: In the *Mumma case, supra,* the unusual event was causing a locomotive whistle to give forth without apparent reason a shrill sound and steam to be emitted, suddenly, while passing under a highway bridge where travelers might lawfully be passing with horses and vehicles. In *Hughes v. Atlantic City and Shore Railroad Company,* 85 *N. J. L.* 212 (*E. & A.* 1913), an electric light globe in the ceiling of a railway car exploded. In *Rapp v. Butler-Newark Bus Line,* 103 *N. J. L.* 512 (*Sup. Ct.* 1927), a wheel of a passenger bus came loose and slipped off its axle, permitting the axle itself to go through the side of the bus and cause the personal injuries sued upon. It is not the doing of an injury to person or property that evokes the application of the maxim *res ipsa loquitur.* It is the unusualness and unexplained elements of the happening, within the knowledge and control of the defendant, from which the injury results. Even if the nature of the present happening had been such as to bring the maxim into operation, the *status* of the case would make the application of it ineffective. No part of the mechanism of the vehicle failed of proper action. There is not the least doubt that the wheels of the bus, functioning in their usual manner, crushed the deceased to his death. Everything was normal except that the deceased in some manner got under the wheels.

The only representation of the defendant who had knowledge of what happened was the driver, who was a witness and who was exhausted of his information. There was no further explanation that the defendant could give. *Res ipsa loquitur* is wholly inapplicable. The case turns on whether or not there was proof upon which the jury could have found liability.

Defendant's motion for dismissal was under *Rule* 3:41-2 which provides that such a motion may be made on the ground that upon the facts and the law the plaintiff has shown no right to relief. Nonsuits are abolished. But in the posture presented by the present motion the familiar rule applies, as on a motion for a nonsuit, that the court must take as true all evidence which supports the view of the party against whom the motion is made and must give him the benefit of all legitimate inferences which are to be drawn therefrom in his favor. *Mulrooney v. O'Keefe*, 98 *N. J. L.* 853 (*E. & A.* 1923); *White v. Metropolitan Life Insurance Co.*, 118 *N. J. L.* 149 (*E. & A.* 1937). We have applied that test, have discovered no right on the part of the plaintiff to relief and, therefore, conclude that the action of the trial court was sound.

The judgment below will be affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD and BURLING—5.

*For reversal*—Justice HEHER—1.