33 N.J. Super. 589 (1955)
111 A.2d 283
HENRY FALK, PLAINTIFF-RESPONDENT,
v.
DANIEL UNGER, ALEX UNGER, T/A UNGER ELECTRICAL CO. AND LORRAINE DRESS SHOP, DEFENDANTS, AND HOLDER ENGINEERING COMPANY, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 17, 1955.
Decided January 25, 1955.
*591 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. John C. Stockel argued the cause for appellant.
Mr. Arthur J. Sills argued the cause for respondent (Messrs. Wilentz, Goldman, Spitzer & Sills, attorneys).
The opinion of the court was delivered by JAYNE, J.A.D.
It was the negligence of the defendant Daniel Unger that proximately caused bodily injury to the plaintiff. His negligence seems to have been imputed both to the defendants Alex Unger, trading as Unger Electrical Co., and to the Holder Engineering Company, Inc., pursuant to the doctrine of respondeat superior. The defendant Lorraine Dress Shop (really Lorraine Smart Shops, Inc.) was voluntarily exonerated from liability by the plaintiff. The jury rendered a general verdict in favor of the plaintiff against the defendants Daniel Unger, Alex Unger, and Holder Engineering Company, Inc., with an award of $15,000 damages. From the consequent final judgment only the Holder Engineering Company prosecutes the present appeal.
Most of the facts pertinent to the litigation are not in doubt and may be here expediently summarized. The Lorraine company was the occupant of a store on Smith Street in the City of Perth Amboy and had contractually engaged the Holder Company to install an air conditioner in the premises. The installation had been almost completed except for the making of the requisite electrical connections *592 when the inspector of the city directed the Holder Company to cease the further fulfillment of its contract because it did not possess a municipal license to perform electrical work in the city.
Mr. Holder of the Engineering Company explained his dilemma to one William Smith, who was a personal friend of the defendant Alex Unger, a licensed electrician. By reason of the endeavors of Mr. Smith, the defendant Alex Unger agreed to complete the installation of the air conditioner for the Holder Engineering Company for the cost of the workmen's insurance coverage, necessary labor and materials.
It was in the pursuit of that undertaking that Alex Unger sent his son Daniel and a helper to the Lorraine premises. The following day, April 7, 1953, while the plaintiff was walking along Smith Street in front of the Lorraine property, Daniel without warning opened the sidewalk cellar door, thereby throwing the plaintiff to the ground, from which mishap the plaintiff sustained his bodily injuries and incidental losses.
Generally stated, the question debated before us is whether there was any evidence adduced at the trial which with permissible derivative inferences legally justified the submission of the alleged liability of the Holder Company to the jury for determination.
This question arises from the denial of the motion made on behalf of this defendant at the close of the plaintiff's case for an involuntary dismissal of the alleged cause of action against it. R.R. 4:42-2(b). Such a motion is recognized as the modern substitute for the former motion for a non-suit. Morsey v. Erle, 4 N.J. 276 (1950); Gentile v. Public Service Coordinated Transport, 12 N.J. Super. 45, 49 (App. Div. 1951).
Where, as here, no motion for a dismissal of the action was made at the conclusion of the trial, nevertheless in the review of a civil action all of the competent and relevant evidence introduced at the trial will be considered in determining whether the denial of the motion at the close *593 of the plaintiff's case constitutes cause for reversal. Glass v. American Stores Co., Inc., 110 N.J.L. 152, 155 (E. & A. 1933); Wright v. Lee Construction Co., 135 N.J.L. 149 (E. & A. 1947); Beck v. Monmouth Lumber Co., 137 N.J.L. 268, 271 (E. & A. 1948); City Nat. Bank & Trust Co. of Salem v. Hassler, 9 N.J. Super. 153, 157 (App. Div. 1950).
Then, too, the rule is applicable that all of the evidence which supports the view of the party against whom the motion is made must be taken as true, and such party must be accorded the benefit of all inferences which may logically and legitimately be drawn therefrom in his favor. Beck v. Monmouth Lumber Co., supra.
Where, however, there are no disputed facts and essentially divergent or oppugnant inferences to be derived from the uncontroverted facts, then it must be adjudged on appeal that the trial judge should have declared the judgment in conformity with the law. Kaufman v. Pennsylvania Railroad Co., 2 N.J. 318 (1949).
In addition to the recognition of the aforementioned established principles, we are invited by the arguments of counsel to apply to the state of the evidence in the present case the criteria expressed in the decisions relative to the so-called "borrowed servant rule." The citations of such decisions are embodied in the more recent opinions in Larocca v. American Chain & Cable Co., Inc., 23 N.J. Super. 195, 201 (App. Div. 1952), and in the affirmance 13 N.J. 1 (1953). See, also, the concurring opinion of Judge Schettino in Devone v. Newark Tidewater Terminal, Inc., 14 N.J. Super. 401, at page 406 (App. Div. 1951).
In association with other enlightening evidential circumstances mentioned in the decisions, the predominant test in our jurisdiction appears to be whether the general employer, or the specific employer, had the right to exercise control over the servant in the performance of his services from which the mishap arose. Yet, the rational efficiency of that test is not free from critical disapprobation. Devone v. Newark Tidewater Terminal, Inc. (concurring opinion), *594 supra; Mechem, Outlines of Agency, § 453 et seq.; 38 Mich. L. Rev. 1228.
The law recognizes an independent contractor to be one who, carrying on an independent business, contracts to perform an undertaking according to his own methods and without being subject to the control of his employer as to the means by which the result is to be accomplished but only as to the result of the work. Errickson v. F.W. Schwiers, Jr., Co., 108 N.J.L. 481 (E. & A. 1932); Wilson v. Kelleher Motor Freight Lines, Inc., 12 N.J. 261 (1953).
It must be frankly acknowledged that the factual circumstances disclosed by the evidence in the present case render the subject of this appeal genuinely controversial. It is evident that the defendant Alex Unger agreed to complete the performance of the electrical work for the Holder Company without profit to himself but as a gracious favor to his friend Smith. While it may be said that the negligent employee, Daniel, was not then engaged in the actual performance of an integral part of the business of his regular employer, it may also be said that he was acting in furtherance of his general employer's personal interests.
Undoubtedly Daniel was regularly employed by his father, who probably possessed the right to discharge him, but admittedly at the time of the accident Daniel was fulfilling the exclusive contractual duty and responsibility of the Holder Company. This circumstance would tend to bring him also within the so-called "whose business rule."
True, however, the employee remains presumptively in the service of his general employer. The burden devolves upon the plaintiff to disclose to a prima facie degree that in fact allegiance had been temporarily transferred. Younkers v. Ocean County, 130 N.J.L. 607 (E. & A. 1943); Restatement of the Law of Agency, § 227, comment (b); Charles v. Barrett, 233 N.Y. 127, 129, 135 N.E. 199 (Ct. App. 1922).
Reference may now be made to the portions of the testimony which are influential in guiding us to our conclusion. The defendant Alex Unger gave the following narrative of *595 the conversation at the interview among Smith, Holder, and himself:
"I received a telephone call that Bill Smith wanted to see me, and I went down to his store, or his shop, and he had a man there that he introduced me to by the name of Mr. Holder. And Mr. Holder  he asked me if I could help Mr. Holder out. And I asked him in what way. He said, well, he was putting in an air conditioning job, and his men had started to put it in, and were almost complete with it, when the City electrical inspector stopped them, because they had no license to do electrical work. And he asked me if I could do something for him, and cover him on that job. Well, I said, there is only one thing that I could do  I was very busy at the time, I didn't care to get involved in this thing, but I said I would help him out by sending a couple of men down to do the job, and whatever the material and the labor would amount to, he could come down and pay us for it. That I wasn't interested in this as a money making proposition, because I am only doing it as a favor to Mr. Smith, from whom I get a lot of work. And he thanked me, and after that, why, I don't remember, I think it was the next day, I sent my son and another man down there, and I was told that Mr. Holder or somebody would be down there to show us what they wanted to have done. And they went down there. And the next thing I heard next day was that a man had fallen and hurt his leg."
Obviously all that the employer Unger consented to do and in fact did was to send "a couple of men down to do the job" and "that Mr. Holder or somebody would be down there to show us what they wanted to have done."
"Q. Now, did you direct your son, or tell your son what to do, or was that done by somebody else? A. I never said anything to him. I told him to go down there and somebody would be down there to show him what to do."
It is manifest that the regular employer gave his employees no instructions whatever except to present themselves for work at the job of the Holder Company. Did he not in such circumstances place them, in so far as he was concerned, entirely and without reservation under the management of the special employer in the particular undertaking? It is not evident that he was in the business of supplying electricians to other contractors.
*596 Assuredly he did not contract to perform the desired electrical work according to his own methods and without the governing directions of the Holder Company, because he appears to have been ignorant of the specific nature, extent and essential particulars of the work and of the kind of materials required. Did he do more than loan qualified employees pro tem to the Holder Company, who under such an arrangement became pro hac vice the servants of that company in the completion of its own exclusive contract? It is fantastic to suppose the two workmen were the servants of neither.
Moreover, this is not a case in which the general employer has entrusted some of his valuable mechanical equipment to his employee and through the continued allegiance of the employee consciously seeks to assure for his own protection the reasonable use, custody, and preservation of the instrument.
When Daniel and his helper arrived at the job the next morning, there was in fact a man there engaged in work incidental to the installation of the air conditioner. Daniel explained:
"You see when a man just starts a job you don't know just what he done. You need someone to tell you just what has been done, and how they expect to finish it. Especially without a print. And that is what he did. He told me how to finish it, and didn't give me any print, and I just went by what he told me and finished it."
Significantly noticeable is the statement "He told me how to finish it * * * and I just went by what he told me and finished it."
"Q. Well, what is the electrical attachment to the air conditioner for but to force cold air through pipes, or through vents, or something like that, isn't that correct? A. That is correct, but it is a very expensive thing, and I wouldn't hook it up unless I had a print from the company showing me what to do, or somebody to tell me what to do."
It is fair here to state that there was no testimony expressly identifying the man from whom Daniel received his directions *597 to have been a representative of the Holder Company, but we think a reasonable inference that he was such arises from the assurance given Alex Unger by Mr. Holder that he "or somebody would be down there to show us what they wanted to have done," and the fact that the man who was present was an active participant in the installation of the air conditioner. It must be realized that contradictions in the testimony are not of present concern. The discovery of testimony and its derivative inferences in favor of the plaintiff's cause of action is the object of our exploration of the evidence.
We are not unaware that in most instances the witnesses used in their testimony the phrase "what to do," but words are slippery things often best understood by the company they keep. The context and the circumstances accompanying and surrounding their utterance may often cause impartial listeners to differ concerning their intended import.
We face the appellate inquiry whether in our judgment the evidence generated reasonable and logical inferences which fair-minded jurors could sensibly adopt that Daniel was in fact pursuing his temporary employment under the directions, management, dictation, and control of the Holder Engineering Company. Our conception of the evidence persuades us that the inquiry should be resolved in the affirmative and that therefore the existence on the unfortunate occasion of a relationship of master and servant between the Holder Company and Daniel Unger of such a nature as to impute by law to the former the responsibility for the tortious conduct of the latter was made by the evidence a question of fact properly to be answered by the jury.
Whether there was adequate evidence of such a divided control of the employee between the regular employer and the special employer in this undertaking to justify the judgment against the regular employer we are neither enabled nor indirectly obliged to determine by the present appeal.
We affirm the judgment of the plaintiff against the defendant Holder Engineering Company, Inc.