37 N.J. Super. 340 (1955)
117 A.2d 305
HARRY SARRIS, PLAINTIFF-APPELLANT,
v.
A.A. PRUZICK & COMPANY, A CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 1955.
Decided October 11, 1955.
*342 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Bernard Chazen argued the cause for appellant (Messrs. Baker, Garber and Chazen, attorneys).
Mr. Joseph V. Cullum argued the cause for respondent (Messrs. Townsend & Doyle, attorneys; Mr. Thomas F. Doyle, of counsel).
The opinion of the court was delivered by JAYNE, J.A.D.
At the conclusion of the evidence adduced by the plaintiff to establish the defendant's liability, the court granted the defendant's motion for an involuntary dismissal of the plaintiff's alleged cause of action.
The following summary of the evidence is necessarily composed in a fashion supporting most favorably the plaintiff's factual allegations. McKinney v. Public Service Interstate Transp. Co., 4 N.J. 229, 243 (1950); Gentile v. Public Service Coordinated Transport, 12 N.J. Super. 45, 49 (App. Div. 1951).
The authorized department of the United States Navy resolved to repair and renovate its ammunition pier at Leonardo, New Jersey, and to effectuate that project contractually engaged Spearin, Preston & Burrows to perform the construction work, including the electrical installations. The Spearin company subcontracted the performance of the electrical work to the defendant A.A. Pruzick & Company, and also subcontracted other work such as the laying of planks, railroad ties and rails to the Charles F. Vachris Co., Inc., in the service of which the plaintiff was employed as a laborer.
*343 Expedition was required in the fulfillment of the contract, and the plaintiff and others served on the "night shift" from 4:00 P.M. to 2:00 A.M., with a recess of a half-hour for a lunch at 9:00 P.M. A qualified electrician arranged the wiring and sockets for the transmission of current to portable lamps which were suitably stationed at the particular locations where the plaintiff and his fellow servants were to work. It is evident that it was the mission and occupation of the electrician to provide the requisite illumination when and where needed by the employees of the Vachris Company while they were engaged in their work at night. The length of the pier is measured in miles.
On the evening of June 11, 1952 darkness began to envelop the vicinity of the pier. The plaintiff's foreman consulted the electrician. When the plaintiff, having finished his lunch, undertook to resume his employment at 9:30 P.M., the nearest light to the location of his work was distant some 300 feet and the locality of his work was described as "pitch dark" and in a state of "complete darkness."
The task of the plaintiff's employment was to help in the removal of old planks, ties and rails on the deck of the pier and in the replacement of new ones. Upon arriving at his place of work, he noticed indistinctly some object which he should remove. In undertaking to lift it he momentarily recognized it to be an electric drill. Upon grasping its handle his fingers or hand evidently contacted the obscure switch immediately below the handle, and the drill suddenly began noisily to operate. The plaintiff was startled jumped backward, tripped and fell over some planks or rails, thus sustaining the bodily injuries for which he sought the recovery of compensatory damages in the present action.
The trial judge expressed two reasons for granting the motion for an involuntary dismissal of the action. The one: "The evidence as I see it, now clearly indicates that this defendant company had no control whatsoever over the electrician, who was supplied by it to the plaintiff's employer. This I conclude in the consideration of the plaintiff's proof." The other reason: "The evidence here does not suggest that *344 the proximate cause of the plaintiff's injury and damage was the lighting or the failure to light the area in question."
In our survey of the evidence anent the first reason stated by the trial judge, we observe that on March 18, 1954 the deposition of the president of the defendant was taken and admitted in evidence at the trial on May 31, 1955. From that deposition the testimony of fundamental pertinency can be harvested. The following quotations are liberally selected and with impartiality.
"Q. When you say, `they,' whom do you mean? A. Vachris. I don't recall but I know they worked during the night and we furnished them an electrician to maintain lights for their operations. That was just a verbal contract with them. We billed them for the man's time on a cost-plus basis.
Q. You are referring now to the electrician that you furnished on a cost-plus basis. A. He was on our payroll.
Q. The electrician was on your payroll and you furnished him to the Vachris Co.? A. Yes, sir.
Q. And the electrician was your own employee, on your payroll? A. Yes.
Q. What was his job? What were his duties there? A. His duty was to maintain any lights that they might require and to plug in the trailers and run some wires for them, give them light wherever they requested light.
Q. Well, then, am I correct in saying that the duty of this electrician was to furnish whatever lights were necessary or required by the Vachris Company during the course of the work it was doing at this pier? A. That they were doing. We weren't working there at the same time they were.
Q. The work that the Vachris Company was doing on the pier. A. Yes.
Q. Did anyone  either yourself or anyone from your company  supervise this electrician? A. No, sir.
Q. He knew his job, I suppose. A. No question in my mind.
Q. What was his name? A. There isn't any one individual every night. On that type of work they have different men. Say a man would work two nights, it would be too much for him to work in the daytime and work at night. They have a man say tonight and tomorrow night and then another fellow the following night, and they would rotate the men and various men would do it.
Q. So that you would have various electricians of your firm who do this work? A. No, we hire men as we need them.
Q. Did the electricians who would be doing the work you just described have a boss over them? A. No, sir. By that do you mean a boss as far as my company 
*345 Q. Yes. A. No, sir.
Q. As far as the lights which they were to use were concerned, who furnished those lights? Would you provide them? A. No, sir.
Q. Where would they get the lights? A. From Vachris.
Q. So that the various lights which were used by these electricians whom you furnished were Vachris lights? A. Yes, sir.

* * * * * * * *
Q. In your arrangement with the Vachris Company when you gave them the contract to do the work, was it your responsibility to see that the lighting was furnished for them while the work was going on, the work that was being done by the Vachris Company? A. No, sir.
Q. What was your understanding with them? A. I was to furnish them a man to give them light, that's all. My responsibility ended there.
Q. And his duty was to see that light was furnished. A. As they needed it or as they requested it  let's put it that way.
Q. As the Vachris people requested it and as they needed it this electrician would see that the light was furnished so they could do their work? A. That is correct.

* * * * * * * *
Q. Will you explain just what the situation was? A. They requested an electrician  for me to give them an electrician when they were working through the night, and I did, on a cost-plus basis. That's all there is to it, as simple as all that.

* * * * * * * *
Q. You had those men on your payroll, you paid them, and the Vachris Company paid you on a cost-plus basis? A. On a cost-plus basis, that's correct.
Q. If anything was done wrong by these electricians  in other words if they didn't do their work properly  would complaints come to you? A. Absolutely.
Q. What would you do about it? A. See that they were remedied, any complaints I would take care of.
Q. If any of these men were not satisfactory I suppose it would be up to you to fire them or  A. To get them somebody else that was satisfactory.

* * * * * * * *
Q. You have used the word, `maintenance.' What do you mean by, `maintenance'? A. Well, by `maintenance' I mean if something is wrong, a cord or a trailer or the lights, they maintain them, see that they are in proper working condition.
Q. When you talk about `they,' do you mean these electricians which you furnished? A. Yes, sir.
Q. So that if there is anything wrong with the lighting  that is the portable lighting, either the wiring or the lights themselves  it would be up to these electricians whom you furnished to see that they are repaired and kept in good order? A. That is absolutely correct.
*346 Q. If new parts were required or material, would that be up to your men  the electricians  to furnish? A. Providing there were none furnished by the Vachris people, I imagine we would.

* * * * * * * *
Q. So that if there were any Vachris men in authority who asked for lights it was up to these electricians whom you furnished to furnish the lights? A. That is correct.

* * * * * * * *
Q. All right, then, what was the purpose of your furnishing electricians for the lighting to be maintained there? A. I said that before. When light is used for construction purposes, a qualified electrician  that is a union agreement  a qualified electrician has to be on the premises to maintain and to furnish  by `furnish' I mean run any wires if necessary or use trailers and things of that sort, so that there wouldn't be any hazard as far as the electrical wiring or trailers is concerned. Let's put it that way.

* * * * * * * *
Q. If a man of Vachris in authority asked this electrician whom you furnished for light and he refused to furnish it  A. I would know about it.
Q. You would know about it. A. I would have known it the very next morning.
Q. And it certainly wouldn't be proper for him under those circumstances to refuse to furnish the light. Is that right? A. Personally I think it would be ridiculous.
Q. It would certainly be improper. A. It would be ridiculous.
Q. Well, he wouldn't be doing his duty, the duty for which you put him there, would he? A. He would have no excuse not to furnish him light if a man asked for it.
Q. It is his duty to do it under those circumstances? A. Of course it is his duty, but there would be no occasion for him not wanting to do it. He is being paid for something, he is getting double time.

* * * * * * * *
Q. Would these electricians whom you furnished as you described, know their job? Would they know the work that they were supposed to do? A. If they worked for me on that job they must have.
Q. And isn't it up to them in their discretion to know just what sort of lights should be provided there while these men are doing their work? A. No, sir.
Q. They have no discretion whatsoever? A. No, sir, it was entirely up to Vachris.
Q. Did you talk to these men, these electricians, before you sent them down to the job? A. No, they know their job.
Q. You didn't give them any instructions? A. No, they were supposed to do whatever Vachris wanted them to do.
Q. You gave them no specific instructions? A. No, sir.
Q. And you say that these men knew their job and you just told them to go to work there. Is that it? A. Yes.

* * * * * * * *
*347 Q. Is it the electricians who transfer these portable lights from place to place on that pier? A. Yes.
Q. That is their job? A. That's right.
Q. So that their job  these electricians whom you referred to  was to move the lights about the pier. Is that right? A. That is correct.
Q. And their job also is to  A. Maintain them.
Q. Maintain the lights and see that they were operating properly. A. That's right, and if I recall, if my memory serves me, I think it was only one man on at any one night.
Q. If any of the lights were out of order  needed a new light  would it be up to your men, the electricians, to get a new light? A. Just what do you mean?
Q. A portable light, say. A. If he couldn't fix them he would go to the Vachris man in authority and tell him about it and he would furnish him with another one. That is about the size of it.
Q. The Vachris people were not electricians? A. No, sir.

* * * * * * * *
Q. Mr. Pruzick, could the electrician whom you supplied to Vachris operate the lights as he saw fit or would he have to operate them in accordance with the directions that he received from Vachris? A. He would have to operate them in accordance with directions he received from Vachris. There is no question about that.
Q. Well, is there any special reason why Vachris had to have an electrician there or could they have plugged in these lights themselves? A. They probably could have plugged them in themselves but as I pointed out before, there is a union agreement that we live up to: Wherever there is a construction going on that requires lighting  particularly at night or if it is dark  a qualified electrician has to be on the job to maintain those lights and place them wherever the people that are doing the work request to have them placed, so they can do their work.
Q. So that the electrician then  his work  is supervised by the party that is doing the actual work? A. No question about it.
Q. In this instance Vachris was the party doing the work? A. Yes.

* * * * * * * *
Q. With reference to the bulbs in these portable lights, the lamps  A. Yes.
Q.  who was responsible for seeing that those were in good order and operating? A. Us.
Q. When you say `us,' you mean the electrician whom you furnished? A. Yes.
Q. And if the light needed a new bulb, if the bulb were out, what would be the duty or the job of your company? A. To go to the Vachris man, ask him for a new bulb and if he hasn't got any we give it to them.
Q. Who puts in the new bulb? A. The electrician.
Q. That is the electrician of your company? A. That is correct.
Q. That is his job? A. Yes, sir."
*348 The foregoing quotations exhibit the state of the uncontroverted pertinent evidence from which the trial judge resolved that as a matter of law the relationship of master and servant between the defendant company and the electrician did not exist. Did he err in that determination?
In the consideration of that question the following decisions may be advantageously consulted: Delaware, L. & W.R. Co. v. Hardy, 59 N.J.L. 35, 38-40 (Sup. Ct. 1896), affirmed on Justice Magie's opinion in the former Supreme Court, 59 N.J.L. 562 (E. & A. 1896); Reisman v. Public Service Corporation, 82 N.J.L. 464 (E. & A. 1911); Courtinard v. Gray Burial & Cremation Co., 98 N.J.L. 493, 496-497 (E. & A. 1923); Busch v. Seaboard By-Product Coke Co., 100 N.J.L. 304, 306-308 (E. & A. 1924); Lacombe v. Cudahy Packing Co., 103 N.J.L. 651, 653-657 (E. & A. 1927); Giroud v. Stryker Transportation Co., 104 N.J.L. 424, 426-428 (E. & A. 1928); Errickson v. F.W. Schwiers Co., 108 N.J.L. 481, 484 (E. & A. 1932); Younkers v. Ocean County, 130 N.J.L. 607 (E. & A. 1943); Larocca v. American Chain & Cable Co., 13 N.J. 1 (1953); Roberts v. Geo. M. Brewster & Son, Inc., 13 N.J. Super. 462 (App. Div. 1951); certification denied 7 N.J. 582 (1951); Gibilterra v. Rosemawr Homes, 32 N.J. Super. 315 (App. Div. 1954), affirmed 19 N.J. 166 (1955); Falk v. Unger, 33 N.J. Super. 589 (App. Div. 1955).
In contrasting the factual background of some of the cited cases with the instant one, it is for example observable that here the electrician was not entrusted with an instrumentality in the operations and preservation of which the defendant retained concern. Here, however, the defendant selected and employed the electricians who were to perform their services periodically. Cf. Roberts v. Geo. M. Brewster & Son, Inc., supra, 13 N.J. Super., at page 467. They were employed and paid for their services by the defendant, who possessed the right to select and to discharge any one of them at any time. Complaints concerning their services were intended to be addressed to the defendant. From their services the defendant was deriving a profit. Cf. Falk v. *349 Unger, supra. The employee remains presumptively in the service of his employer.
Moreover the evidence is productive of the inference that the electricians were regarded as specialists in their trade whose training and experience qualified them to be exclusively and independently entrusted with the manner in which the wires and connections were furnished for the required illumination, and that the plaintiff's employer or its foreman only indicated to the particular electrician in attendance when and where to supply the current for the illumination of the portable lamps, which constituted only a cooperative notification of the locality to which the work was expected to progress with the need of lights.
And then there was evidence which generated the permissible inference that the contractual obligation which the defendant assumed to fulfill was not merely to select and supply to the plaintiff's employer the services of an electrician, but to provide the necessary need of illumination at the site of the work to be performed by the plaintiff and his co-workers.
In our appellate inquiry we confront the question whether in our explorative conception of the evidence, it erected to a prima facie degree reasonable and logical inferences which fair-minded jurors could sensibly adopt that the electrician employed by the defendant on the occasion of the plaintiff's mishap was guilty of a dereliction of duty legally imputable to the defendant under the principle of respondeat superior. We conclude that in the tenor of the evidence the existence or absence of the relationship of master and servant between the electrician and the defendant should with proper instructions relative to the applicable principles of law have been submitted to the jury for determination as a question of fact.
The theory of the plaintiff's cause of action is that the defendant being engaged as an independent contractor in the undertaking to furnish illumination in those portions of the pier at which the employees of the Vachris Company were at work was under the legal duty to exercise ordinary *350 care in the performance of that service for the safety of the plaintiff, who was lawfully on the pier. Vide, Bacak v. Hogya, 4 N.J. 417 (1950).
We allude incidentally to a feature of the trial which has also attracted our attention. The plaintiff was precluded from disclosing the conversation between the plaintiff's foreman and the electrician in attendance, the import of which was probably a request for lights. It seems apparent that the basic reason for the ruling was that the person to whom the foreman spoke was not shown to have been an electrician in the employ of the defendant. It was eventually stipulated at the close of the plaintiff's proof that the person was in fact one of the electricians to whom the president of the defendant company referred in his deposition. Indeed, such might well have been inferred from the deposition itself. In our conception of the evidence the ruling of the court was erroneous.
The second reason for the dismissal of the action was the persuasion of the trial judge that the failure of the defendant to provide the needed illumination was not the efficient cause, the cause which originated the other causes, and that which naturally and probably led to, and which might have been expected to occasion, such a mishap. Vide, Hellstern v. Smelowitz, 17 N.J. Super. 366, 372 (App. Div. 1952).
Too much has already been written on the principle of the relativity of causation in tort cases to condone any further juridical treatment of the subject in the present case.
Suffice to express our conviction that in the factual circumstances of this case the problem of proximate cause was one conventionally to be submitted to the jury for solution. So also the plaintiff's alleged voluntary assumption of the hazards.
While we acknowledge that the points predominantly emphasized by counsel in this appeal are genuinely debatable in character, our review of the state of the evidence impels us to disapprove the decision of the trial judge in dismissing the action as a matter of law.
Reversed and a new trial accorded. Costs to abide.